Stephen J. KOZY, Plaintiff/Appellee,

v.

Robert W. WERLE, Defendant/Third–Party Plaintiff/Appellant,

v.

William E. McDONALD, Jr., Third–Party Defendant/Appellee.

Court of Appeals of Tennessee, Middle Section.

Feb. 24, 1995.

Application for Permission to Appeal Denied by Supreme Court May 30, 1995.

W.A. Moody, Moody, Whitfield & Castellarin, Nashville, for defendant/third-party plaintiff/appellant.

Robert L. Callis, Mt. Juliet, for plaintiff/appellee.

Kurt V. Beasley, Brentwood, for third-party defendant/appellee.

## *OPINION*

TODD, Presiding Judge.

The defendant/third-party plaintiff, Robert W. Werle, has appealed from orders awarding judgments against him and in favor of Stephen J. Kozy, plaintiff, for $7,500 plus $2,500 fee, and dismissing Werle's third-par-

ty action against William E. McDonald, Jr., third-party defendant.

On appeal, defendant presents the following issues:

1. Whether the trial judge erred in directing a verdict for the plaintiff in a suit on a note and directing a verdict for the third-party defendant at the conclusion of all the testimony.

2. Whether the court erred in attempting to establish a "reasonable attorney fee" on the note without a jury when a jury was timely demanded.

This action was brought in General Sessions Court for principal of $7,500.00 and attorneys' fees provided in a note. Upon removal to the Circuit Court, defendant filed a jury demand and answered, admitting his signature on the note and alleged that his signature was obtained by misrepresentation of plaintiff and William E. McDonald.

By leave of Court, defendant joined his answer to a third-party complaint against William E. McDonald who answered denying liability and asserting the defense of statute of limitations.

On February 4, 1994, the Trial Court entered the following order:

> This cause came to be heard before Judge Hamilton V. Gayden, Jr., and a duly empaneled jury on January 26, 1994, and at the close of all the proof the plaintiff and third-party defendant having moved for a directed verdict in their favor on all issues and the Court being of the opinion that the motion should be granted,
>
> It is ordered that the plaintiff, Stephen J. Kozy, have and recover of the defendant, the sum of $7,500.00 plus attorney fees and the costs of the cause. Plaintiff's attorney shall submit a motion and affidavit regarding the amount of attorney's fees requested and the Court will establish fees.

Thereafter, counsel for plaintiff filed an application for $3,900.75 fees supported by affidavit of details.

On April 29, 1994, the Trial Court entered the following order:

> A hearing was conducted on the 22nd day of April, 1994, on the motion of the defendant, Robert W. Werle, to strike plaintiff's application for attorney's fees. On defen-

dant's motion, plaintiff's response, arguments of counsel, and the briefs submitted by the parties, the Court finds that said motion is not well taken and is hereby overruled. Plaintiff's counsel shall set a hearing date for a hearing on the plaintiff's application for attorney's fees and the amount of fees to be awarded shall be determined by the Trial Judge.

Thereafter, the Trial Court awarded $2,500 attorney's fees and dismissed defendant's third-party complaint.

*-First Issue: Directed Verdict-*

■■ In ruling upon a motion for directed verdict the trial judge is required to take the strongest legitimate view of evidence opposing a directed verdict and to overrule the motion unless a reasonable person could draw only one conclusion from the evidence, and that in accordance with the motion. *Crosslin v. Alsup,* Tenn.1980, 594 S.W.2d 379; *Smith v. Inman Realty Co.,* Tenn.App. 1992, 846 S.W.2d 819.

There is uncontradicted evidence of the following facts:

William E. McDonald, Jr., is an investment counsellor who specializes in soliciting investors to contribute "seed money" for the development of promising investment projects.

Plaintiff and defendant are investors who advance such "seed money" in the hope of "getting in on the ground floor" of profitable investments.

Defendant visited and was impressed by a restaurant in Tampa, Fla., named "the Kapok Tree." He discussed with the owners a license for use of the name in opening a similar restaurant in Nashville. He returned to Nashville, advanced and obtained from others "seed money," which was used to promote the idea. The initial effort failed, but he promised the investors that a new effort would be made and, if it were successful, they would participate.

Defendant McDonald undertook to solicit new "seed money" which was furnished by plaintiff, defendant and others and deposited to the credit of "Kapok Tree, Inc.," although no such corporation was ever organized. The money was disbursed by McDonald for development expenses, largely incurred by defendant.

When the initial funds were exhausted, McDonald undertook to secure additional "seed money" from investors. When he approached plaintiff he was told that plaintiff would advance no more without security. McDonald promised to secure security and later reported to plaintiff that he would get a note to secure $7,500 of plaintiff's investment. Thereupon plaintiff made an additional advancement of "seed money" to the "Kapok Tree, Inc.'s" development fund. McDonald then presented to plaintiff for his signature the following note:

> $7,500.00 Nashville, Tennessee, July 1, 1988 for value received, we jointly and severally promise to pay to the order of Stephen J. Kozy the sum of Seven thousand five hundred and 00/100 dollars to be paid as follows: in full on September 30, 1988, non-interest bearing This note is secured by development fees from Kapok Tree, Inc., a Tennessee corporation.
>
> If any installment of this note and/or the payment of interest as provided herein is not paid at the time and place specified herein, the entire principal and interest unpaid shall be due and payable at once at the election of the holder of this note. All parties hereto whether makers, endorsers, sureties, guarantors, or otherwise, hereby waive notice of dishonor, protest, notice of protest and notice of non-payment of this obligation and further waive all exemptions whether homestead, exempt property or otherwise to which they or any of them may now or hereafter be entitled under the laws of this State or any other State. Each of the undersigned hereby agree that additional signatures may be added, either above or below any signatures hereto.
>
> If placed in the hands of an attorney for collection, or if placed in judgement, we agree to pay a reasonable attorney's fee.

> _____  /s/ Robert W. Werle
>
> Address    Name        Address
>
> _____  /in print/ Robert W. Werle
>
> Address    Name        Address

> (in print) John Goodhue, Attorney for Kapok Tree, Inc.
> Turnley & Goodhue
> First American Center
> Nashville, Tennessee 37238

There is no evidence that there was any discussion as to the capacity in which defendant signed the note.

Appellant relies upon isolated bits of the testimony of the three parties to establish a "mutual understanding and intent of the maker and payee of the note that the maker was not to be personally liable upon the note."

Plaintiff testified in pertinent part as follows:

A. Sometime about mid year it looked like things were starting to founder. Progress wasn't being made. They had run out of whatever money they had accumulated, and Bill came to me and said we need a little bit more money in this project. And I said, well, I don't want to put any more money in this project. Very frankly, I was getting a little lukewarm about the project at that time myself.

... And, as it turned out, there was a need for about another $10,000 over and above what I was willing to risk in this project. I said, well, I will put that money in if I can get some guarantee that I'm going to get it back.

And he went to Werle and came back with the thought that if I would put up another initial amount of money, they would somehow or another get me $2,500 back very quickly and give me a promissory note for the other $7,500.

Q. Was there any discussion about who was going to sign that note?

A. I expected Werle to sign the note, as he was the only officer or—he was the only—what you might say chief in the Kapok business. There wasn't anybody else who could sign the note.

Q. Were you looking for one that was obligating Mr. Werle, or were you looking for something to obligate some corporation or some other entity?

A. Well, there was no other entity. There was no corporation as far as I knew. I was looking to him because he was the one who was getting the money.

. . . .

We,—he called me, and so later on, maybe a month later, I went down to Grand Old Golf where he was working on the place, and I spoke to him personally. And I said, "Look, Bob, we need to get this straightened out." And we went through the whole thing, and he gave a lot of commentary on the project and why it wasn't—why it failed—why it failed and everything went off, and he told me—

THE COURT: Go ahead.

A. —told me at that time that he had a couple of other projects that were going to come through or materialize or turn over by the time of the New Year, sometime after Christmas, and that he would get back with me right after the New Year. And, of course, I never heard from him again.

. . . .

A. In fact, I said I didn't want to put any more money in. I was making a loan to Mr. Werle to try to save his butt so that he might possibly bring the project through and save my original $5,000.

. . . .

Q. And you're telling the jury that you made a loan of $7,500 to Mr. Werle?

A. Yes. I'm telling you exactly that.

Q. Every check that you made to back up your investment has been payable to Kapok, has it not?

A. That is correct.

Q. You have never, never given a check to Werle, as a loan?

A. That's not correct.

Q. All right, sir. Let me see the check that you have given to Mr. Werle which is for the loan in this lawsuit.

A. I maintain, sir, that if I write a check to Kapok Tree and in my mind Werle is Kapok Tree, that's the same as writing a check to Werle. Just because it doesn't have any name on it—I knew where it was going, and he knew where it was going or he wouldn't have signed this note.

. . . .

Q. All right, sir. Your lawyer has given me two checks, and I want you to look at them, if you would, sir, and tell me whether or not they're checks that were written and signed by you.

A. They are, yes.

Q. To what entity are they made payable?

A. They're made payable to Kapok Tree Group.

. . . .

Q. Tell the jury what you wrote these checks for.

A. The first one says for initial stock.

. . . .

A. First, at this time Kapok was an idea. There was no stock in Kapok Tree. It wasn't even incorporated as far as I know. This was—it maybe was the wrong word to use down here, but the fact of the matter is I was not buying stock because there is no stock in Kapok Tree. There was no stock. Nobody ever delivered any stock as a result of this check.

. . . .

Q. Tell me what it represents.

A. What it represented was money that I had been asked to put into the Kapok Tree operation, which I expected to get back, and which I made all the arrangements to get back by getting this note executed.

. . . .

A. I didn't do that. I wrote the check and gave it to Bill. When he—

Q. Bill is McDonald?

A. Bill McDonald. When he gave the money to Mr. Werle and got the note signed I don't really know about. All I know is he brought the note back to me dated July 1st.

. . . .

A. ... That second check was sent along with Bill McDonald with instructions that this money only goes into Kapok Tree if I get this note from Mr. Werle.

McDonald testified in pertinent part as follows:

Q. All right. Now, was any stock issued?

A. No. I mean it was just a name to start to try to operate under.

Q. What was the money to be used for?

A. Well, most of it, if not all of it—I'd have to, you know, recall. It went to Bob Werle personally.

Q. What did it go to him for?

A. Well, he just needed some money.

. . . .

Q. Okay. Did he say he was willing to put in some more money?

A. On the first time he said I'll go ahead and put in a little more money, but I want to get some of my other money back.

Q. How much did he want to get back?

A. He wanted to get it all back, but all I could see—out of that 30,000, the biggest chunk of that money went to Bob Werle just for some additional fees and expenses. So he wanted to get some back out of that, and Bob couldn't afford to give him all of his money back, so he gave him 2,500.

. . . .

Q. How did that promissory note come about, Mr. McDonald? What happened to get Mr. Werle to sign it, and how did it all come about?

A. Well, he was receiving a payment, and so the new money people, which we—see, there was three—there was six people, you know, agreed that Bob Werle would draw so much of that money out. And that was going to go to his business, and so we just kind of made arrangements that he would pay back part of it.

. . . .

Q. Did Mr. Kozy ask you to get that promissory note signed?

A. Yes.

Q. Did he ask that Mr. Robert W. Werle sign it?

A. Yes.

Q. And did you do that?

A. Yes.

. . . .

Q. Now, that note has a couple of things on it. It was down in the collateral part that this note is secured by development fees from Kapok Tree, Inc., a Tennessee corporation. What is a development fee?

A. A developer is not ever—he's a person who sort of starts a project, will oversee the construction management, will oversee the financial aspects of it, and is just kind of the general person—and you normally think of a developer as being some person who starts something from, you know, scratch, not from buying something already in existence.

Q. What person was in a position to receive development fees from this project?

A. Well, the number one person would have been Bob Werle.

Q. Okay. So when this note says this note is secured by development fees from Kapok Tree, we're talking about fees that Mr. Werle would individually receive; is that correct?

A. Right. . . .

. . . .

Q. Did at any time Mr. Werle tell you he didn't think he ought to have to pay that note or that you or Mr. Kozy made some misrepresentation to him about the note?

A. No.

Q. Had you ever heard that before this lawsuit was filed?

A. No, not until last January, I believe is when I was served on this lawsuit.

. . . .

Q. Now, Mr. McDonald, . . . All this money that you invested and that he invested, and other people invested, went into a checking account controlled by you?

A. Correct.

Q. All right. And as you told this jury earlier, Mr. Werle was not even authorized to draw checks on this account?

A. I don't believe so.

. . . .

Q. No, but if Mr. Werle incurred expenses, out-of-pocket money, in trying to promote this corporation, was he not entitled to reimbursement?

A. Who from?

Q. From the corporation.

A. What corporation?

Q. Kapok Tree.

A. There's not a Kapok Tree Corporation.

Q. Well, sir, why did you put the money in Kapok Tree, Incorporated, if there was no Kapok Tree Corporation?

A. Because we were maybe going to do it at some point in the future.

. . . .

Q. Sir, why did you print in that note secured by—

A. Development fees.

. . . .

A. Because in late June or July of 1988 we determined that it was worth putting a little more money in to keep it going, and we knew that if we kept it going that if something else happened we would have a viable project that we could fully fund with a bank loan and with more investor money in the fall. So the reason this was written in here is because there was going to be a time when Mr. Werle could have drawn some additional money, and we wanted to have this note on—in front of the dispersing agent at that point so that we could have gotten—when I say we, Mr. Kozy could have gotten paid out of the next round of money.

Defendant testified in pertinent part as follows:

Q. And what was your job, your function in this development?

A. Develop the plans, work with the various groups, management groups that develop the concept of the restaurant, the planning of the building, taking prices for the building, permits from the city, those kinds of things.

. . . .

Q. All right, sir. Did you personally solicit any money from Kozy, McDonald, or anyone allegedly in his group?

A. Just Mr. McDonald—just Bill McDonald.

. . . .

Q. I think, sir, you accrued expenses?

A. Correct.

Q. You hired architects?

A. Right.

Q. And you hired engineers. And I assume that you submitted bills—

A. That's correct.

Q. And who did you give those bills to?

A. Either the—either Bill McDonald or John Goodhugh, the attorney.

. . . .

Q. Okay. Now, tell us about the note. When is the first time you saw this note, and just tell this jury the circumstances on which this note was brought to you.

A. Bill brought it by—

. . . .

Q. McDonald?

A. Yes.

. . . .

A. —brought it by one day. I'm note sure what the date was, to tell you the truth; in the summer, I remember that. And what he explained to me was that one of his investors wanted to limit the amount that he was investing, wanted to change his mind, or whatever. . . . So he said—he showed me this instrument, and I saw the "we" on it and "development fees." And, you know, I was essentially agreeable. If there were money that was there in the development of the restaurant at some point, if someone wanted to withdraw their investment, I was agreeable to it.

. . . .

Q. You signed that note, didn't you?

A. On behalf of the corporation, yes, sir.

. . . .

Q. Okay. Mr. Moody asked you a question about getting some money, didn't he? You got paid some living expenses out of this project, did you not?

A. I would bill from time to time a portion of my cost, just like I would bill another job, sure.

Q. And you individually got money out of it?

A. My firm did. I had a staff of people that was working on this, and I had—I paid them. You know, I had rent and phone.

. . . .

A. Right.

Q. Okay. Can you state specifically where Bill McDonald misled you in this whole scenario?

A. The only reason I signed it was that I wanted to express my agreement with the fact that if there were monies in the corporation to lessen one of the investors'—you know, the amount of his investment, then I was agreeable to it. So that's how I understood it and that's why I signed it.

■ The intent or understanding of one party to a contract, uncommunicated to the other by word, action, or circumstance, cannot have any binding effect upon the other. *Ward v. Berry & Associates, Inc.*, Tenn.1981, 614 S.W.2d 372.

■ Where a contract shows on its face that there is no ambiguity nor an undisclosed principal, parol evidence is not admissible to vary its terms. *Cartwright v. Giacosa*, 216 Tenn. 18, 390 S.W.2d 204 (1965).

■ To be the subject of correction, a mistake in an instrument must have been mutual or there must have been a mistake of one party induced by the fraud of the other. *Pierce v. Flynn*, Tenn.App.1983, 656 S.W.2d 42.

Defendant cites *United American Bank v. First Citizens National Bank*, Tenn.App. 1988, 764 S.W.2d 555; however, in that case, the signature was followed by the corporate title of the signer.

Defendant cites *Acme Metals, Inc. v. Weddington*, Tenn.App.1978, 575 S.W.2d 15; however, in that case, the signer was president of an established corporation which owed the payee an open account for which the note was given, and the note recited in its face "Knoxville Casket Co. promises to pay to the order of Acme Metals."

■ Defendant argues that there was no consideration for the note. It is clear that defendant needed additional capital to develop his project, that he authorized McDonald to seek the capital contributed by plaintiff in consideration of the note. Moreover, the reluctant contribution of additional capital was a detriment to plaintiff.

■ Consideration consists when the promisee does something that he is under no legal obligation to do or refrains from doing which he has a legal right to do. *Brown Oil Co., Inc. v. Johnson*, Tenn.1985, 689 S.W.2d 149.

■ "Valuable Consideration" is either benefit to the promisor or prejudice to the promisee. 210 Tenn. 24, 356 S.W.2d 277 (1962).

Nothing is found in the evidence to justify a reformation of the note to relieve defendant of personal liability upon his note.

■ Likewise, no evidence is found that defendant was misled by the third-party defendant, McDonald. The mere insertion of the provision, "This note secured by development fees from Kapok Tree, Inc., a Tennessee Corporation" did not constitute any fraud or misrepresentation inducing defendant to sign the note. There was no such corporation, and defendant knew it. The parties understood that the meaning of the insertion was that, if additional "seed money" should be raised from others, the payee of the note could claim a refund of $7,500 of his investment, but this does not constitute grounds for finding that defendant's personal obligation, plainly stated in the note, was not enforceable.

No reversible error is presented by defendant's first issue.

*-Second Issue: Attorney's Fee-*

■ As stated above, plaintiff sued for principal *and* attorney's fee. The note provides for "a reasonable attorney's fee." No evidence was offered to the jury as to the reasonable amount of attorney's fee. The Feb. 4, 1994, order of the Trial Court awarded plaintiff $7,500 in response to a motion for directed verdict which is stated in the transcript as follows:

MR. CALLIS: Your Honor, I would at this time move for a directed verdict in the plaintiff's favor on all issues. Your Honor, this is a suit on a note. Mr. Moody has talked about the ambiguity in this note. There is no ambiguity in this note whatsoever, Your Honor. Mr. Werle has admitted signing the note. It's uncontradicted that the full $7500 is owed.

Thereafter, the Trial Judge made the following announcement:

THE COURT: Ladies and gentlemen of the jury, at the end of the case the plaintiff made a motion for a directed verdict on the note, and the defendant, Mr. McDonald, made a directed verdict on his motion that there was no proof of fraudulent inducement.

And the Court has found, as a matter of law, that the note is a valid note signed by an individual who signed it jointly and severally, and it is a note under the law. And, therefore, I find in the amount of $7500 for the plaintiff. And there's no question for the jury to answer. And I dismissed the case against Mr. McDonald on the question of fraudulent inducement.

So, therefore, I'll ask you to nod in the affirmative, and a nod in the affirmative is a finding in the affirmative for the plaintiff. You are excused. You may check down at the fourth floor and see if they need you further.

It is clear from the record that the case was closed and verdict and judgment rendered without any presentation to the court or jury of a request for attorneys' fees or evidence in support thereof.

On March 3, 1994, plaintiff's attorney filed his "application for attorneys' fees" with supporting affidavit. While this application was filed within the time allowed for post-trial motions, it presented an issue as to which a jury had been demanded, but no evidence had been submitted to the jury. Under these circumstances, the Trial Court was not authorized to resolve a jury issue without the interposition of a jury. This is especially true because the defendant filed counter affidavits raising a genuine issue as to the amount of fee to be awarded. Defendant also moved to strike the application for fees in response to which the Trial Court in its order of April 29, 1994, stated "the amount of fees to be awarded shall be determined by the Trial Judge."

Thus, it cannot be said that the determination of fees without a jury was by mutual consent or acquiescence.

 A litigant has a constitutional right *to have* all issues of fact tried at the same time by the same jury. *Winters v. Floyd,* 51

Tenn.App. 298, 367 S.W.2d 288 4 A.L.R.3rd 450 (1962).

The Trial Court therefore erred in adjudging disputed attorneys' fees without the intervention of a jury, after the close of evidence and rendition of judgment. The lapse of thirty days after judgment without motion for a new trial precludes the grant of a new trial before another jury.

The judgment of the Trial Court in favor of plaintiff for $7,500 dismissing the third-party complaint is affirmed. The judgment in favor of plaintiff for $2,500 attorneys' fees is reversed and vacated. Costs of this appeal are taxed equally, that is, one-half to plaintiff and one-half to defendant. The cause is remanded for any further necessary proceedings.

Affirmed in part, reversed in part, remanded.

LEWIS and CANTRELL, JJ., concur.