Erric **WALKER**, Steve **Ricketts**, and Vickie **Atchley**, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**RYAN'S FAMILY STEAK HOUSES, INC. Defendant.**

No. 3:02–1078.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 2, 2003.

918

Morris Reid Estes, Jr., Stewart, Estes & Donnell, Nashville, TN, for Plaintiffs.

William A. Blue, Jr., Constangy, Brooks & Smith, Nashville, TN, Edward Grantland Burns, Nexsen, Pruet, Jacobs & Pollard, LLC, Greenville, SC, James Matthew Coleman, Constangy, Brooks & Smith, LLC, Fairfax, VA, for Defendant.

## *MEMORANDUM*

TRAUGER, District Judge.

Pending before the court is defendant Ryan's Family Steak Houses, Inc.'s Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings (Docket No. 7), to which plaintiffs have responded (Docket No. 80; Docket No. 99) (contemporaneously filing, in the response documents, a Motion for Recission of EDSI Arbitration Agreements and a Renewed Motion for Expedited Court–Supervised Notice and Order Compelling Defendant to Expeditiously Disclose the Identities of Similarly Situated Employees), and defendant has replied (Docket No. 100).

## Factual Background

Defendant Ryan's Family Steak Houses, Inc. ("Ryan's") is a Delaware corporation, with its principal place of business in South Carolina, that owns and operates a chain of over 300 restaurants in twenty-two states. (Docket No. 8, Affidavit of Randy Hart ¶ 4.) Plaintiffs are current and former employees of Ryan's who have brought this collective action to remedy alleged widespread and pervasive violations of the wage provisions of the Fair Labor Standards Act ("FLSA") by Ryan's, who they contend has deprived the named plaintiffs, and other similarly situated individuals, of their lawful wages.[1] (Docket No. 1, Collective Action Complaint for Violations of the Fair Labor Standards Act of 1938 ¶ 1.) For purposes of this motion, the only relevant facts concern the plaintiffs' execution of an agreement to submit all potential disputes arising from their employment with Ryan's to binding arbitration.

Since 1993, Ryan's has had in place an agreement with Employment Dispute Services, Inc. ("EDSI") (formerly Employment Dispute Resolution) under which EDSI agrees to provide an arbitral forum for all Ryan's job applicants, employees, and the company itself, in exchange for annual payment from Ryan's. (Docket No. 82, Ex. 2, Deposition of James P. LaCoste, Jr. at 24; Docket No. 82, Ex. 18, Agreement to Provide Services.) In turn, Ryan's requires all job applicants, prior to being considered for employment, to sign a document entitled variously "Job Application Agreement to Arbitration of Employment–Related Disputes" or "Job Applicant Agreement to Arbitration of Employment–Related Disputes" ("the Agreement") with EDSI, under which applicants agree to submit any and all employment-related disputes to EDSI's arbitration process and forego their right to have claims heard in a judicial forum. (Docket No. 82, Ex. 4, Applicant Packet; Docket No. 8, Ex. 1, Walker Agreement; Docket No. 8, Ex. 2, Ricketts Agreement; Docket No. 8, Ex. 3, Atchley Agreement.) If an applicant refuses to sign the Agreement, she will not be considered for employment with Ryan's. (Docket No. 82, Exh. 6, Deposition of James Randolph Hart at 23; Docket No. 82, Ex. 3, Deposition of Judy Kramer at 53–54.) Ryan's is named in the Agreement as a third party beneficiary. (Docket No. 82, Ex. 4, Agreement ¶ B.2.D.)

EDSI is a small corporation, consisting of two directors/owners, James P. LaCoste, Jr. and Robert Berman, and one administrator, Judy Kramer. (Docket No. 82, Ex. 2, LaCoste Dep. at 21.) The company was formed in 1992, largely in response to the U.S. Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), with the aim of providing a third-party arbitration service, the Employment Dispute Resolution Program, for the fair and expeditious resolution of employment-related disputes, modeled af-

---

1. The original named plaintiffs are Erric Walker, Steve Ricketts, and Vickie Atchley. Plaintiffs filed contemporaneous with their complaint a Notice of Filing of Consents to Become Party Plaintiff for the three representative plaintiffs (Docket No. 4, Ex. 1), and for ten additional plaintiffs—Kay Cole, Nanella Dukes, Karen P. Holt, Virginia Jordan, Kaprece Keaton, Jennifer Kurtz, Adelaide Midkiff, Julie M. Oaks, Benjamin A. Sinclair, and April Williamson (Docket No. 4, Ex. 2). Eight additional plaintiffs were added later: Jeffrey W. Comley, Sharon Henry, Sharon Pinckney, Angie G. Lee (Docket No. 12, Notice of Consents to Become Party Plaintiffs, Ex. 1), Alicia T. McGill (Docket No. 17, Notice of Filing of Consent to Become Party Plaintiff, Ex. 1.), Deborah D. Bellamy, Paula K. Reuther, and Lanetta R. Kannady (Docket No. 61, Notice of Consents to Become Party Plaintiffs, Ex. 1). There are twenty-one plaintiffs in total.

ter the program used in the securities industry. (Docket No. 82, Ex. 2, LaCoste Dep. at 10; Docket No. 10, Affidavit of James P. LaCoste, Jr. ¶¶ 3, 4.) Providing and administering an arbitral forum for employers and employees is EDSI's sole business, and EDSI currently has contracts with employers and employees in numerous states to provide arbitration pursuant to this program. (Docket No. 10, LaCoste Aff. ¶¶ 10, 11.) EDSI has approximately twelve employer-signatories (or clients) at present; a large number of them are companies in the restaurant industry. (Docket No. 82, Ex. 3, Kramer Dep. at 82, 85.) Each employer-signatory pays an annual fee in order to subscribe to the service, calculated according to the number of employees they have. *Id.* at 88. In calendar year 2002, EDSI grossed approximately $100,000. (Docket No. 82, Ex. 2, LaCoste Dep. at 104.) Ryan's pays EDSI a $42,500 annual fee. (Docket No. 82, Ex. 3, Kramer Dep. at 92; Docket No. 82, Ex. 8, EDSI Transactions by Account.)

If EDSI is contacted by an employee or an employer regarding a potential claim, that person is sent a claim form and a copy of the EDSI Rules and Procedures ("the Rules") that will govern the arbitration. (Docket No. 9, Affidavit of Judy Kramer ¶ 4.) In order to file a claim, claimants are required to pay a filing fee and to submit that claim to the EDSI forum. (Docket No. 82, Ex. 1, 2000 Rules at 3; Docket No. 82, Ex. 3, Kramer Dep. at 56.) According to Judy Kramer, who has worked for EDSI as the administrator for over five years, no employer has been the initiating party in an arbitration in that time. (Docket No. 82, Ex. 3, Kramer Dep. at 97.) Under EDSI's Rules [2], the claims are de-

cided by a three-member adjudication panel. (Docket No. 82, Ex. 1, 2000 Rules at 3.) One adjudicator is chosen from each of three separate pools—a group of supervisors or managers of an employer-signatory, a group of non-exempt employees (under the Federal Wage and Hour law) who are signatories to EDSI Agreements, and a group of attorneys, retired judges, or other competent legal professionals not associated with either party. *Id.* at 3–4. In assembling the panel, EDSI provides a list of three potential adjudicators from each of the three pools (none of whom has ever been employed by the employer in the dispute), and the complainant and defendant each strike one name from each pool, until a three-member panel remains. *Id.* at 4. Adjudicators may always be struck for cause. *Id.* at 4.

The experiences of the plaintiffs in this case are all substantially similar to the experiences of the three representative plaintiffs and former Ryan's employees—Vickie Atchley, Steven Ricketts, and Erric Walker. Vickie Atchley was employed as a server at Ryan's Lee Highway store in Chattanooga, Tennessee from approximately May 1994 to June 2002. (Docket No. 83, Declaration of Vickie Atchley ¶ 3.) She has an eighth-grade education and was an unemployed single mother when she applied for the job at Ryan's. *Id.* at ¶ 6. Steven Ricketts also worked at the Ryan's Lee Highway store in Chattanooga, as a server and cook (though he performed other job duties as well) from approximately July 1997 through October 2000. (Docket No. 93, Declaration of Steven Ricketts ¶¶ 3, 4.) When Ricketts went to work for Ryan's, he was married with one child, in debt, and his wife was not work-

---

**2.** This discussion of the EDSI arbitrator selection process is derived from the version of the Rules promulgated in June 2000. The arbitrator selection provisions of the four other versions of the Rules, from the years 1993, 1994, 1998, and 1999, are nearly identical to

that provision in the 2000 Rules and are the same in all material respects. (Docket No. 82, Exh. 1, 1993 Rules at 3, 1994 Rules at 3, 1998 Rules at 4–5, 1999 Rules at 2–3, 2000 Rules at 3–4.)

ing. *Id.* at ¶ 7. Erric Walker worked for several different Ryan's over various periods from approximately November 1993 through June 2001. (Docket No. 95, Declaration of Erric Walker ¶ 3.) Walker has a high school education and worked as a floor manager, among other duties. *Id.* at ¶ 10.

The plaintiffs assert that, immediately before or immediately after their hire, they were given application papers to sign while at Ryan's. (Docket No. 83, Atchley Decl. ¶ 5; Docket No. 93, Ricketts Decl. ¶ 5; Docket No. 95, Walker Decl. ¶ 6.) They assert that they were not told about the arbitration agreement. (Docket No. 83, Atchley Decl. ¶ 5; Docket No. 93, Ricketts Decl. ¶ 5; Docket No. 95 Walker Decl. ¶¶ 6, 7.) Ricketts and Walker state that they were never given a copy of an arbitration agreement or any rules or procedures, and Atchley states that she was not given any forms to take home and read before signing or to keep for her records. (Docket No. 93, Ricketts Decl. ¶ 5; Docket No. 95, Walker Decl. ¶ 8; Docket No. 83, Atchley Decl. ¶ 5.) None of the three can recall or were aware of signing an arbitration agreement, and Atchley and Walker state that they did not know they had signed an arbitration agreement until after this lawsuit was filed. (Docket No. 93, Ricketts Decl. ¶ 6; Docket No. 83, Atchley Decl. ¶ 5; Docket No. 95, Walker Decl. ¶ 9.) As a floor manager, Walker conducted orientations for new employees at Ryan's but was never trained or asked to mention any arbitration program by his supervisors. (Docket No. 95, Walker Decl. ¶ 10.) He asserts that he told applicants what he had been told by managers who hired him—that they were required to sign all forms in the packet to be considered for employment. *Id.* The record in this case includes signed arbitration agreements executed by each of these three plaintiffs.[3]

James Randolph Hart, who directs the human resources department at Ryan's, asserts that everyone who applies for a position with Ryan's, including the President and CEO, is required to sign an arbitration agreement as part of the application process. (Docket No. 82, Ex. 6, Hart Dep. at 23, 24.) He asserts that, as of 1996 or 1997, the job application, the Agreement, and the EDSI Rules were all merged into one application package, and job applicants were permitted to retain the copy of the Rules provided with the package whether they were hired or not. *Id.* at 38. He asserts that it is written company policy (part of the manager training program and written on the front of the application package) that applicants are to be able to retain the Rules. *Id.* at 43. Hart also asserts that, prior to 1996 or 1997 and since 1993, Ryan's would offer a laminated copy of the Rules to an applicant as she filled out an application, so that she could review it if she wanted and return it before leaving. *Id.* at 38. Additionally, Hart asserts that applicants who are hired undergo an orientation process, during which they are required to acknowledge, by signature in the Ryan's Team Member Folder provided, that they had previously read and understood the arbitration policy and that a copy of the Rules was previously provided. (Docket No. 82, Ex. 6, Hart Dep. at 54; Docket No. 82, Ex. 5, Ryan's Team Member Folder.)

### *Analysis*

### I. Compelling Arbitration

■ In deciding whether to compel arbitration of a federal statutory claim, the

---

**3.** Erric Walker's Agreement was signed on September 22, 2000. (Docket No. 8, Ex. 1, Walker Agreement.) Steven Ricketts's Agreement was signed on June 1, 1998. (Docket No. 8, Ex. 2, Ricketts Agreement.) Vickie Atchley's Agreement was signed on May 26, 1994. (Docket No. 8, Ex. 3, Atchley Agreement.)

court must first consider whether the statutory claim is generally subject to compulsory arbitration. If this question is answered in the affirmative, the court considers whether the parties have executed a valid arbitration agreement and, if so, whether the statutory claim is within the scope of the agreement. *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 311–12 (6th Cir.2000) (citing *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). This court is aware that many state and federal courts have considered the EDSI forum and Agreement and that those courts have both upheld it and found it wanting.[4]

A. *Whether the Statutory Claim Is Generally Subject to Compulsory Arbitration*

■ The court first considers whether the statutory claim is generally subject to

compulsory arbitration. The U.S. Supreme Court and the Court of Appeals for the Sixth Circuit recognize a liberal federal policy favoring arbitration agreements. *See Gilmer*, 500 U.S. at 25, 111 S.Ct. 1647 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 652 (6th Cir.2003) (en banc) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, 103 S.Ct. 927). The Supreme Court has acknowledged that arbitration agreements contained in contracts for employment are enforceable under the Federal Arbitration Act ("FAA"), except as to transportation workers. *Circuit City v. Adams*, 532 U.S. 105, 109, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). The Sixth Circuit has also held that pre-dispute mandatory arbitration agreements are enforceable. *See Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 307 (6th Cir.1991) (relying

---

4. *See Lyster v. Ryan's Family Steak Houses, Inc.*, 239 F.3d 943 (8th Cir.2001) (finding arbitration could be compelled because the dispute was within the scope of the Agreement and the Agreement was not an unconscionable adhesion contract); *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753 (7th Cir.2001) (striking down the Agreement as unenforceable); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir.2000) (finding the Agreement unenforceable as lacking in consideration); *Mahan v. Ryan's Family Steak Houses, Inc.*, No. 4:02–cv–82 (E.D.Tenn. Jan. 29, 2003) (compelling arbitration with minimal review of validity of the Agreement); *Tenaglia v. Ryan's Family Steak Houses, Inc.*, C.A. No. 4:02–2684–25BH (D.S.C. May 9, 2003) (compelling arbitration on a variety of grounds with substantial analysis); *Gooden v. Ryan's Family Steak House, Inc.*, No. CIV.A.02–0201, 2002 WL 927783 (E.D.La. May 7, 2002) (compelling arbitration with minimal review of validity of the Agreement); *Palmer v. Ryan's Family Steak Houses TLC, Inc.*, No. 2:02–CV–1589 (W.D.La. Sept. 16, 2002) (compelling arbitration with no inquiry into validity of the Agreement); *Gardner v. Ryan's*, No. 1:01CV00030, 2001 WL

1352113 (W.D.Va. Oct. 31, 2001) (compelling arbitration on finding that EDSI had adequately addressed the illusory promise problem); *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F.Supp.2d 985 (S.D.Ind.2001) (refusing to compel arbitration based on bias, unconscionability, lack of consideration, and other factors); *Campbell v. Ryan's Family Steak House, Inc.*, No. 2:99CV052–P–B, 2000 U.S. Dist. LEXIS 2460 (N.D.Miss. Feb. 28, 2000) (upholding the Agreement on minimal review); *Ryan's Family Steak Houses, Inc. v. Regelin*, 735 So.2d 454 (Ala.1999) (compelling arbitration on minimal review); *Stadtlander v. Ryan's Family Steakhouses, Inc.*, 794 So.2d 881 (La.Ct.App.2001) (finding the Agreement viable and controlling over a strong dissent); *Rembert v. Ryan's Family Steak Houses, Inc.*, 235 Mich.App. 118, 596 N.W.2d 208 (1999) (remanding to determine whether Agreement was enforceable under its findings); *Scruggs v. Boswell*, No. 01–CVS–691 (N.C.Super.Ct. Nov. 2, 2001) (finding the *Floss* problem had been adequately addressed and compelling arbitration); *Drayton v. Ryan's Family Steak Houses, Inc.*, No.2000–CP–22–691 (S.C. Ct. Com. Pleas Aug. 7, 2001) (compelling arbitration with minimal review of the Agreement).

heavily on the Supreme Court's reasoning in *Gilmer*). That a plaintiff's claim is grounded in a statutory right does not necessarily foreclose the arbitrability of the claim. *See Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S.Ct. 3346. The Supreme Court has reasoned that, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* at 628, 105 S.Ct. 3346. While not all claims based on statutory rights are suitable for arbitration, *id.* at 627, 105 S.Ct. 3346, the Sixth Circuit has specifically approved compulsory arbitration of FLSA claims. *Floss*, 211 F.3d at 313 (finding FLSA claims to be suitable for arbitration when the specific forum allows for effective vindication of the claims, but refusing to compel arbitration because the arbitration agreement lacked consideration).

■ The Sixth Circuit has cautioned, however, that the specific arbitral forum must provide for effective vindication of statutory rights before claims implicating those rights can be subject to mandatory arbitration. *Id.* at 313 (citing *Gilmer* for the proposition that specific arbitral fora must allow for effective vindication of statutory claims in order to serve the remedial and deterrent functions of statutes). *See also McMullen v. Meijer, Inc.*, 337 F.3d 697, 703 (6th Cir.2003); *Morrison*, 317 F.3d at 658. In determining whether specific arbitral fora have provided for proper vindication of statutory claims, the Sixth Circuit has considered such factors as the neutrality of the forum, evidence of bias, parties' opportunities for discovery, cost-splitting provisions, limitations on remedies, and the arbitrator selection process. *See McMullen*, 337 F.3d at 703–05 (arbitrator selection process); *Morrison*, 317 F.3d at 668–73 (cost-splitting provisions and limitations on remedies); *Floss*, 211 F.3d at 313–14 (neutrality of the forum, evidence of bias, parties' opportunities for discovery, cost-splitting provisions, and arbitrator selection process).

Many of the defendant's main arguments seeking to compel arbitration implicate those factors that the Sixth Circuit has analyzed to determine the suitability of the arbitration forum. The defendant broadly argues that EDSI is a neutral forum for dispute resolution. (Docket No. 11, Memorandum of Law in Support of Ryan's Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings at 13.) In defense of the EDSI forum's neutrality, the defendant states that there is no connection between EDSI and Ryan's beyond EDSI's contractual promise to provide dispute resolution services; that the process by which adjudicators are selected is fair and impartial; and that the rules are fair and unbiased (for example, the discovery procedures). *Id.* at 14, 16. The defendant also argues that there is no structural bias in the forum. *Id.* at 17. In asserting a lack of structural bias, Ryan's states that most cases considering this agreement have upheld the EDSI forum and that the Supreme Court rejects arguments based on potential, instead of actual, bias. *Id.* at 18–20.

The plaintiffs, on the other hand, argue that the EDSI arbitral forum is rife with structural bias against the plaintiffs. (Docket No. 99, Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings at 36.) They urge the court to follow cases that have considered the EDSI agreement substantively, including *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753 (7th Cir.2001) and *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F.Supp.2d 985, 995 (S.D.Ind.2001), and found the forum to be filled with institutional bias and partiality. (Docket No. 99 at 40.) The plaintiffs cite three specific

examples of structural bias: (1) EDSI has permitted Ryan's labor and employment counsel to modify and craft the rules that govern the agreement; (2) EDSI unilaterally eliminated a class action provision from the arbitration agreement, suggesting favoritism to employer-clients; and (3) the employee pool from which EDSI draws its adjudicators is comprised of employees who have been pre-selected by other signatory employers, presumably as employees that the employers trust. *Id.* at 41.

For the reasons cited by the plaintiffs and for other reasons, not only apparent to this court but also raised by the Sixth Circuit in both *Floss* and *McMullen,* this court finds that the EDSI forum is not able to provide for effective vindication of statutory claims and is an inappropriate substitute for the judicial forum.

The most compelling reason that the EDSI forum is fundamentally unable to provide an effective substitute for the judicial forum is that EDSI both exercises control over the pool of potential arbitrators and relies on the favor of its employer-clients for its livelihood. The Sixth Circuit has expressed its serious reservations about this very issue in its decision in *Floss.* While the record in *Floss* did not reflect whether EDSI was a for-profit entity (the American Arbitration Association is not), the court speculated about the potential conflict between EDSI's financial interests and its ability to provide a neutral arbitral service. *See Floss,* 211 F.3d at 314. If EDSI were operating on a for-profit basis, its interest in maintaining the satisfaction of its corporate clients would engender a bias which, together with its control over the pool of potential arbitrators, "would render the arbitral forum fundamentally unfair." *Id.* (citing *Cole v. Burns Int'l Security Servs.,* 105 F.3d 1465, 1482 (D.C.Cir.1997) ("At a minimum, statutory rights include both a substantive pro-

tection and access to a neutral forum in which to enforce those protections.")).

In *McMullen,* the Sixth Circuit reiterated its concern. There, the court struck down an arbitration agreement that it described as otherwise "commendably fair" solely because the employer exerted unilateral control over the pool of potential arbitrators. *McMullen,* 337 F.3d at 703. The Sixth Circuit in *McMullen* compared the arbitrator selection process in that agreement to EDSI's arbitration selection process that it had previously described as "fundamentally unfair" and found that it suffered from infirmities similar to the EDSI process (in an even greater degree)—a symbiotic relationship between employers and arbitrators and an inherent risk of bias in favor of the employer. *See id.* at 705.

The arbitrator selection process that troubled the Sixth Circuit in these cases is still in place. Further, the record in this case adds a crucial piece to the puzzle confirming that the arbitrator pool, and thus the forum, inherently lacks neutrality: EDSI is a for-profit enterprise. (Docket No. 82, Ex. 2, LaCoste Dep. at 105.) EDSI is reliant on the continuing satisfaction of its employer-clients for its financial viability. In fact, the record reflects that almost half of EDSI's gross income in 2002 was generated from Ryan's annual fee. The inherent bias in this position, coupled with EDSI's role in selecting arbitrators, condemns the forum's ability to be impartial. Additionally, EDSI has designed a system whereby employers are able to exert tremendous control over the construction of two of EDSI's three pools of arbitrators. The pool of managers and supervisors is comprised entirely of representatives from EDSI's employer-clients. The pool of employees is comprised entirely of employees who are vetted by their employer-signatories, presumably as man-

agement-friendly employees. Essentially, employers pre-select two of the three pools of arbitrators, and EDSI merely arranges the individual panels from these groups,[5] already skewed in favor of management. There is little distinction between this selection process and the process condemned in *McMullen*, where the employer directly selected the pool of potential arbitrators.

The defendant argues that there are protections at the stage of panel selection that mitigate potential bias. Members of Ryan's management or staff never sit on a panel adjudicating a claim against Ryan's. (Docket No. 11 at 15.) The third adjudicator on every panel is drawn from a list of attorneys and retired judges provided by Resolute Systems, Inc., not EDSI. *Id.* Claimants and employers are able to strike potential arbitrators who are offensive for any reason at panel selection and may also strike arbitrators for cause. *Id.* The court finds that these protections are unavailing at this late stage. When the process begins with a skewed pool as to two of the three arbitrators, EDSI is fundamentally unable to provide an impartial forum. The Sixth Circuit has repeatedly signaled its disapproval of the EDSI arbitration forum on grounds including its questionable arbitrator selection process and has struck down another forum solely for this reason. This court concludes that the flaws in the arbitrator selection process, coupled with other crucial defects, are fatal to the fo-

rum's ability to effectively vindicate a claim.

Although limited discovery provisions are common in arbitration as a means of streamlining the process, the limited discovery available in the EDSI forum burdens the employee-claimant far more heavily than the employer, suggesting structural bias in favor of the employer. Both parties may request production of documents and are required to exchange witness lists and documents to be offered into evidence prior to arbitration. (Docket No. 82, Ex. 1, 2000 Rules at 4–6.) However, parties are able to schedule only one deposition as of right, and additional depositions are strongly disfavored, even under the current Rules: "Either party may file a request with the adjudication panel for additional depositions, but such requests are not encouraged and shall be granted *in extraordinary fact situations only and for good cause shown.*" *Id.* at 6 (emphasis added). Employment claims often require an employee to conduct many depositions (e.g., co-workers, supervisors, etc.) to make out her case, while employers are often able to defend such claims with only one deposition—that of the employee. Thus, employees usually have a need for more discovery than employers, and stringent limitations on depositions such as those promulgated by EDSI more heavily burden the employee than the employer. Additionally, this court has previously noted that the rules of the American Arbitra-

---

**5.** EDSI follows an artless, haphazard method of constructing lists of potential adjudicators for specific panels that confirms that the real work has already been done by the employer-signatories. Judy Kramer, EDSI's legal administrator and sole full-time employee, describes how she chooses the initial list of arbitrators when a claim arises:

> I go through the list. And first of all, I try not to put the same person on a panel twice in a row. Or if somebody is serving on a panel, I don't call that person. And I just

go through and ask them if they are willing to serve at this time. And then the first three people I get is who I put down.
> Q. Okay. Do you have any particular methodology for doing that? Do you do it alphabetically, or do you just assign numbers and do it?
> A. I just said. If they're presently serving on a panel, I don't call them. And if they have just recently served on a panel, I don't call them. (Docket No. 82, Ex. 3, Kramer Dep. at 118.)

tion Association and the Judicial Arbitration and Mediation Services/Endispute are relatively liberal in affording additional discovery "where necessary to a full and fair exploration of the issues in dispute." *See Wilks v. Pep Boys*, 241 F.Supp.2d 860, 865 (M.D.Tenn.2003). This liberal attitude towards discovery stands in stark contrast to EDSI's strict requirement that additional discovery should issue only in "extraordinary fact situations" and "for good cause shown."

Other aspects of the forum are troublesome and support a finding of structural bias in favor of employers. EDSI eliminated from the 1999 and 2000 Rules a phrase allowing for class actions that was part of the 1993, 1994, and 1998 versions.[6] A recent Supreme Court decision concluded that whether class arbitration is permitted under an arbitration agreement that did not discuss its availability is a question of contract interpretation for the arbitrator, not the court, to decide. *See Green Tree Financial Corp. v. Bazzle*, —— U.S. ——, ——, 123 S.Ct. 2402, 2407, 156 L.Ed.2d 414 (2003). In this case, EDSI unilaterally eliminated from its rules a provision allowing class actions, suggesting an intent to preclude them. Given an intentional removal, instead of mere silence, it would be difficult for an arbitrator to interpret the Agreement to allow class arbitration under the Rules. The unavailability of class arbitration again burdens employees and benefits employers. Employees must shoulder the fees of individual arbitration themselves and must summon the wherewithal to pursue individual claims that might be common to other employees; this disincentive might result in fewer claims, to the benefit of employers. Moreover, in the Fair Labor Standards Act area particularly, often each individual claim results in a small monetary remedy, whereas class actions often result in practice and programmatic change that benefit all employees.

■ Also, although EDSI has eliminated a cost-splitting provision from its 1999 and 2000 Rules and now requires the employer to shoulder all costs other than the initial $125 filing fee [7] and the employee's attorneys fees, the status of the cost-splitting provision in arbitrations governed by earlier rules is far from clear. (Docket No. 82, Ex. 1, 1999 Rules at 5, 2000 Rules at 7.) The 2000 Rules allow claimants to choose whether the arbitration will be governed by the Rules in effect at the time of the claim's filing, or by the Rules in effect at the time the employee-claimant signed the Agreement. (Docket No. 82, Ex. 1, 2000 Rules at 2.) If the claimant elects to have the Rules from 1993, 1994, or 1998 govern, she will be subject to the cost-splitting provision of those earlier rules, which requires the costs of arbitration to be borne equally by the parties. (Docket No. 82, Ex. 1, 1993 Rules at 6, 1994 Rules at 6, 1998 Rules at 9.) Under the Sixth Circuit's articulation of the proper inquiry for determining whether

---

6. The language providing for class actions was as follows: "These Rules and Procedures are applicable to resolve disputes involving individual or employer claims and/or claims of several parties, including group or class actions." (Docket No. 82, Ex. 1, 1993 Rules at 1, 1994 Rules at 1, 1998 Rules at 1.) In the 1999 and 2000 versions of the Rules, the sentence ends after the words "several parties." (Docket No. 82, Ex. 1, 1999 Rules at 1, 2000 Rules at 1.)

7. Defendant asserts in one place that the filing fee is $125 and in another that the fee is $200. (Docket No. 11 at 17; Docket No. 100, Ryan's Reply Memorandum of Law in Support of Its Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings at 11.) It appears that the filing fee was initially $200 but that EDSI reduced the fee to $125 in its 1999 Rules, where it remains. (Docket No. 82, Exh. 1, 1993 Rules at 7, 1994 Rules at 7, 1998 Rules at 11, 1999 Rules at 5, 2000 Rules at 8.)

cost-splitting provisions in arbitration agreements are enforceable, cost-splitting provisions are unenforceable if they would deter a substantial number of similarly situated potential litigants from pursuing arbitration because of limited financial resources. *Morrison,* 317 F.3d at 663. Given the limited means of most of these plaintiffs and the potentially high cost of arbitration, this cost-splitting provision is likely unenforceable. Although, as in *Morrison,* the offending provision is probably severable from the rest of the Agreement because of the savings clause in the Agreement (Docket No. 82, Ex. 4, Agreement ¶ B.2.F), the defendant's silence on this matter suggests that Ryan's might attempt to enforce it.

Finally, the court is troubled by the fact that EDSI and Ryan's shared Jackson Lewis LLP for many years as their common law firm, particularly since that firm was permitted to modify the EDSI rules during that period. (Docket No. 82, Ex. 2, LaCoste Dep. at 36.) While this fact on its own is too attenuated to be considered preclusive of effective vindication of a statutory claim (especially since this conflict no longer exists [8]), it suggests an uncomfortable proximity and potential professional conflict for the attorneys involved, and, in combination with the other issues detailed above, adds to this court's finding that the forum is too structurally biased to provide an effective substitute for the judicial forum.

The defendant argues that any potential for bias is outweighed by the protections afforded by EDSI in its rules and procedures. The remedies available through EDSI arbitration are not limited; the Agreement states that a claimant preserves "all the substantive legal rights and remedies under state and federal law that [she] would otherwise have as an employee/applicant of the Company." (Docket No. 82, Ex. 4, Agreement.) The $125.00 filing fee that the claimant must pay may be waived upon a showing of indigency, and the employer is required to pay all costs of arbitration once a claim is filed (except the claimant's attorney's fees). Employee-claimants are afforded the right to counsel or a representative of their choice, and the employer must respond to all claims in writing. (Docket No. 82, Ex. 1, 2000 Rules at 3.) The parties may request that the arbitrators' award detail in writing the findings of fact and a statement of reasons for results reached. *Id.* at 7. The court is not convinced that these protections are sufficient to mitigate the plainly apparent institutional bias against employees. The defendant also argues that potential or hypothetical bias should not condemn an arbitral forum, especially given procedural protections, when limited judicial review is available if actual bias arises in a particular forum or award. (Docket No. 11 at 18.) *See also Gilmer,* 500 U.S. at 30–31, 111 S.Ct. 1647; *Mitsubishi Motors Corp.,* 473 U.S. at 634, 105 S.Ct. 3346. The Sixth Circuit addressed this argument in *McMullen,* and its conclusion is adopted by this court:

> While this is true for allegations of potential or hypothetical bias among the arbitrators, it does not apply to an allegation, as is present here, that the arbitrator-selection process is fundamentally unfair…. When the process used to select the arbitrator is fundamentally unfair, as in this case, the arbitral forum is not an effective substitute for a judicial forum …. *McMullen,* 337 F.3d at 705.

Here, the potential for bias becomes a virtual assurance of bias when a for-profit

---

**8.** EDSI secured alternate counsel for all its legal affairs when the conflict became apparent, during either the *Floss* or *Geiger* litigation. (Docket No. 82, Ex. 2, LaCoste Dep. at 38–39.)

entity seeks to provide a "neutral" arbitral service, while simultaneously relying on the continuing satisfaction of its employer-clients for its livelihood, and tailors many of its crucial procedures to favor employers. Under this scheme, EDSI is fundamentally unable to provide a neutral forum or effectively vindicate employees' statutory rights. Thus, the plaintiffs' statutory claim is not subject to compulsory arbitration.

## B. Whether the Parties Have Executed a Valid Agreement

■ Although the court finds that the infirmities of the EDSI forum are sufficiently widespread and significant to deny the defendant's motion to compel arbitration under the first inquiry, the court also finds that the motion fails under the second inquiry. The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2003). If a court finds a claim to be generally subject to compulsory arbitration, the court must consider whether the parties have executed a valid agreement. In determining the validity of an agreement to arbitrate, the court applies applicable state law contract principles. *See Morrison*, 317 F.3d at 666; *Floss*, 211 F.3d at 314; *Cooper v. MRM Investment Co.*, 199 F.Supp.2d 771, 775 (M.D.Tenn.2002). Tennessee law is properly applied in evaluating the enforceability of this Agreement, because the Rules establish that arbitra-

tors are to apply the substantive law of the state in which employees were employed in evaluating their claims (Docket No. 82, Ex. 1, 2000 Rules at 6), here Tennessee,[9] and the parties appear to agree that Tennessee law determines the contract's validity.

The defendant urges the court to compel arbitration, arguing that the Agreement is a valid, enforceable contract. Ryan's asserts that the contractual defect that impeded the enforcement of the Agreement in *Floss* has been rectified by EDSI's revision in June 2000 of the Rules, allowing claimants to choose whether the procedures of the forum will be governed by the Rules in effect at the time of filing, or by the Rules in effect at the time the employee-claimant signed the Agreement. (Docket No. 11 at 6–7.) The defendant further asserts that, because EDSI is subject to the implied duty of good faith and fair dealing, EDSI would not amend the rules in bad faith. *Id.* at 8–9. According to the defendant, the Agreement is not an unconscionable contract of adhesion because prospective employees could have walked away from employment at Ryan's at any time instead of being bound by the terms of the Agreement, *id.* at 21–22, and because the Agreement does not contain terms that are so unreasonably harsh as to render it substantively unconscionable. (Docket No. 100 at 19.) Finally, the defendant states that plaintiffs should be bound by the agreements that they freely and voluntarily executed, (Docket No. 11 at 23), and asserts that it would be inappropriate for the court to apply a heightened

9. Vickie Atchley worked as a server from approximately May 1994 to June 2002 at Ryan's in Chattanooga, Tennessee. (Docket No. 83, Atchley Decl. ¶ 3.) Steven Ricketts worked as a server and cook from approximately July 1997 to October 2000 at Ryan's in Chattanooga, Tennessee. (Docket No. 93, Ricketts Decl. ¶¶ 3, 4.) Erric Walker worked at various Ryan's locations over an eight-year period, as follows: Jackson, Tennessee, November 1993

to November 1994; Hermitage, Tennessee, April 1995 to April 1996; Sikeston, Missouri, December 1997 to November 1999; Hermitage, Tennessee, September 2000 to June 2001. (Docket No. 1, Compl. ¶ 9.) Walker signed the Agreement in connection with his employment at the Hermitage, Tennessee, Ryan's on September 22, 2000. (Docket No. 8, Ex. 1, Walker Agreement at 2.)

standard to the requirement of employee knowledge for waiver of their constitutional rights. (Docket No. 100 at 20.)

The plaintiffs argue that the contract is unenforceable for a number of reasons. First, they assert that the Agreement suffers various infirmities in formation: that there is not adequate consideration, that the contract remains illusory under *Floss* (a defect that invalidated this Agreement in an earlier incarnation), and that there is no meeting of the minds between EDSI and employees. (Docket No. 99 at 17, 18, 23.) The plaintiffs further argue that, even if there is a valid contract, EDSI has materially breached that contract by failing to provide a fair, neutral forum. *Id.* at 34–35. Plaintiffs conclude by arguing that the Agreement itself is an unconscionable contract of adhesion and that EDSI failed to obtain a knowing and voluntary waiver from employees of their constitutional rights. *Id.* at 44–46.

Having found that the motion to compel arbitration fails under the first inquiry, because the EDSI forum is an inadequate substitute for the judicial forum to effectively vindicate plaintiffs' statutory rights, the court is not obligated to consider the second inquiry—the validity of the arbitration agreement. However, given that the *Floss* court condemned an earlier EDSI agreement on grounds of inadequate consideration, the court will consider whether EDSI has remedied that defect in the Agreement currently at issue.

1. *Adequacy of Consideration and Indefiniteness as to an Essential Element*

One of the essential elements of a contract is adequate consideration, which Tennessee law defines as "either a benefit to the maker of the promise or a detriment to or obligation on the promise" or "when the promisee does something that he is under no obligation to do, or refrains from doing [that] which he has a legal right to do." *Calabro v. Calabro,* 15 S.W.3d 873, 876, 877 (Tenn.Ct.App.1999) (quoting *Univ. of Chattanooga v. Stansberry,* 9 Tenn.App. 341, 343 (Tenn.Ct.App.1928) and *Kozy v. Werle,* 902 S.W.2d 404, 411 (Tenn.Ct.App.1995)) (alterations in the original). Mutual promises may constitute ample consideration for a contract, especially in the context of services contracts. *See Buraczynski v. Eyring,* 919 S.W.2d 314, 321 n. 6 (Tenn.1996); *Rodgers v. Southern Newspapers, Inc.,* 214 Tenn. 335, 379 S.W.2d 797, 800 (1964). Mutual promises to be bound under an arbitration agreement can constitute adequate consideration. *See Pyburn v. Bill Heard Chevrolet,* 63 S.W.3d 351, 358 (Tenn.Ct.App. 2001).

Nonetheless, "a promise constitutes consideration for another promise only when it creates a binding obligation. Thus, absent a mutuality of obligation, a contract based on reciprocal promises lacks consideration." *Floss,* 211 F.3d at 315 (citing *Dobbs v. Guenther,* 846 S.W.2d 270, 276 (Tenn.Ct.App.1992)). One way in which a promise may fail to create a legally binding obligation is by being illusory— essentially promising nothing at all, or allowing the promisor to decide whether or not to perform the promised act. *See Floss,* 211 F.3d at 315; *Pippin Way, Inc. v. Four Star Music Co. (In re Four Star Music Co.),* 2 B.R. 454, 460 (Bankr. M.D.Tenn.1979) ("A promise that does not put any limitation on the freedom of the alleged promisor but leaves his future action subject only to his own will is illusory. It is not enforceable against the one making it nor operative as a consideration for a return promise."). A promise may also be illusory if it is too indefinite to be enforceable. *See Floss,* 211 F.3d at 315; *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn.2001). A court reviewing a contract must be able to ascertain what obligations the respective parties

have in the performance of the contract, and the contract must be sufficiently definite and certain to allow the court to make such a determination. *See id.; Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 565 (Tenn.Ct. App.1990); *see also Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn.Ct.App.1991).

■ In this Agreement, applicants for employment at Ryan's promise to submit all employment-related claims to the EDSI arbitral forum in return for EDSI's promise to provide an unbiased forum with impartial procedures and a fair hearing and decision. (Docket No. 82, Ex. 4, Agreement ¶¶ B.1, B.2.A.) In *Floss*, the Sixth Circuit struck down an earlier incarnation of the Agreement, due to the indefiniteness, and consequent illusoriness, of EDSI's promise to provide an arbitral forum. *Floss*, 211 F.3d at 315. The *Floss* court condemned the forum because EDSI had reserved the right to change the arbitration rules without notice to or consent of employees, thereby retaining the "unfettered discretion" to alter the nature of its performance at any time while requiring a defined performance from the employee. *Id.* at 315–16. Without a definite set of procedures, EDSI's promise to provide an arbitral forum was illusory, thereby lacking mutuality of obligation and defeating consideration. *Id.*

In response to *Floss*, EDSI added a choice provision both to the Agreement and to the 2000 Rules. (Docket No. 82, Ex. 2, LaCoste Dep. at 42–43; Docket No. 82, Ex. 4, Agreement ¶ B.2.A; Docket No. 82, Ex. 1, 2000 Rules at 2.) Under this provision, claimants may choose whether the arbitration will proceed according to the Rules in place at the time that the employee signed the Agreement or according to the Rules in place at the time the employee filed the claim. The defendant argues that, while EDSI still retains the right to unilaterally modify the Rules, the choice provision remedies the defect that proved fatal to the Agreement in *Floss* by explicitly defining the nature of its performance as one of two options that the employee can choose.[10]

EDSI's modification does address the *Floss* court's particular concern by defining the nature of its performance. Allowing a claimant to elect the procedures in place at the time she signed the agreement rather than those currently in effect at the time she files the claim might put the employee in a more favorable position than she had been prior to the choice provision, but it still does not cure the fact that, by changing the rules without notice to or consent of employees, EDSI imposes a unilateral, material change on the Agreement that employees have already signed.[11] Employees who signed agree-

---

**10.** The court does not credit the defendant's argument that EDSI's ability to modify the Agreement is moderated by its implied duty under Tennessee law of good faith and fair dealing, which renders its promise non-illusory. (Docket No. 11 at 8–9.) The *Floss* court did not rest its condemnation of the Agreement on EDSI's potential bad faith; rather, it targeted the elusiveness of the content of EDSI's promise, which would have rendered legal enforcement of the promise extremely difficult. *Floss*, 211 F.3d at 315–16.

**11.** There is a provision in the Rules that allows EDSI to convene a committee consisting

of representatives of each of the three arbitrator pools (including signatory employees) and EDSI to review the Rules and recommend changes to them. (Docket No. 82, Ex. 1, 2000 Rules at 7.) However, LaCoste confirms that such a committee has never been convened. (Docket No. 82, Ex. 2, LaCoste Dep. at 58.) The four revisions made to the Rules since the first set of rules were issued in 1993 have been entirely directed by LaCoste, most often in response to court decisions interpreting or affecting the Agreement. (Docket No. 82, Ex. 2, LaCoste Dep. at 45–47.)

ments prior to the promulgation of the 2000 Rules are still subject to those new rules by reference, if only for long enough to refer them to another set of procedures. Furthermore, the fact remains that employees are not notified either by EDSI or by Ryan's when the Rules are modified, nor do they receive an updated copy of the Rules. (Docket No. 82, Ex. 2, LaCoste Dep. at 60–62; Docket No. 82, Ex. 6, Hart Dep. at 76–77.)

Ultimately, the choice provision does not cure the continuing illusoriness of EDSI's promise to provide a neutral arbitral forum. While the *Floss* Court focused on the fact that EDSI had a continuing right to alter or modify the terms of its performance, the Court also stated that illusoriness can occur when "the promisor retains the right to decide whether or not to perform the promised act." *Floss*, 211 F.3d at 315. Courts applying Tennessee law have expounded on this tenet: "It is a settled principle of contract law that a provision permitting the termination of the contract by one party at will renders the contract illusory …." *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1296 (6th Cir.1991). *See also Pippin Way, Inc.*, 2 B.R. at 460 ("[A] contract with an arbitrary right or option to cancel lacks mutuality and is unenforceable.")

EDSI's agreement with Ryan's contains a cancellation provision, under which Ryan's may cancel its service agreement with EDSI on either ten or sixty days' notice,[12] resulting in both being released from their obligations. With such a cancellation, EDSI would no longer be under an obligation to provide any kind of arbitral forum to Ryan's employees.[13] Employees are not told of Ryan's cancellation provision in any documents provided by EDSI, nor are employees given a corresponding right under the Agreement to unilaterally cancel their own agreements with EDSI.[14] (Docket No. 82, Ex. 2, LaCoste Dep. at 82.) EDSI's ability to terminate its contracts with Ryan's employees at will, without notice to them,[15] renders its promise illu-

---

12. It is unclear from the record whether the Ryan's agreement continues to allow a ten-day cancellation period, or whether it is now held to a sixty-day cancellation period, as are EDSI's other clients. The Agreement to Provide Services, which governs the relationship between Ryan's and EDSI, indicates a ten-day cancellation period, but LaCoste asserts that the ten-day period should have been extended to a sixty-day period, as it has been with all EDSI's clients. (Docket No. 82, Ex. 18, Agreement to Provide Services; Docket No. 82, Ex. 2, LaCoste Dep. at 71.)

13. LaCoste testified as follows:
Q. Okay. After a company gives notice, and ten days passes under that provision, what is it that the company, or EDSI, no longer has to do? What services were terminated?
A. Well, the company would no longer have to pay EDSI for the ability to participate in the program, and EDSI would no longer have to provide the forum for the employee to use as a method to resolve dispute. (Docket No. 82, Ex. 2, LaCoste Dep. at 73.)

14. Although the agreements signed by the representative plaintiffs and the agreement currently in force permit the contract to be terminated, it must be by mutual termination in writing by both EDSI and the employee. (Docket No. 8, Ex. 1, Walker Agreement at 2; Docket No. 8, Ex. 2, Ricketts Agreement at 2; Docket No. 8, Ex. 3, Atchley Agreement at 2; Docket No. 82, Ex. 4, Agreement ¶ B.2.G.) As LaCoste himself agrees, the employee is not permitted to unilaterally give notice and cancel her obligations under the Agreement, as Ryan's may under its service agreement with EDSI. (Docket No. 82, Ex. 2, LaCoste Dep. at 81.)

15. Although EDSI is provided with notice of Ryan's cancellation, either directly or when Ryan's ceases payment (Docket No. 82, Ex. 3, Kramer Dep. at 77), there is no indication that EDSI (or Ryan's) notifies employees of Ryan's cancellation, nor that EDSI notifies employees of the resultant cancellation of its own binding obligation, and thus contract, with employees.

sory on alternate grounds than those discussed in *Floss*, with the same effect—mutuality of obligation, and therefore consideration, is defeated. Without consideration, EDSI's contract with plaintiffs is invalid and unenforceable.

### 2. *Other Contractual Infirmities and Waiver of the Judicial Forum*

Having found that the plaintiffs' statutory claims are not subject to compulsory arbitration, because of the defects in the EDSI forum, and that the parties have not executed a valid contract due to the lack of consideration, the court is not obligated to consider whether other contractual infirmities invalidate the Agreement or whether the plaintiffs knowingly and voluntarily waived their right to a judicial forum. However, because these issues have factored into the court's thinking in this case, the court will address these other issues.[16]

#### a. *Enforceability of an Adhesion Contract*

■ Besides being unenforceable as lacking in consideration, the Agreement also has all the hallmarks of an unenforceable adhesion contract. Under Tennessee law, an adhesion contract is a standardized form offered on what amounts to a "take it or leave it" basis, without affording the weaker party a realistic opportunity to bargain, and under conditions whereby the weaker party can only obtain the desired product or service by submitting to the form of the contract. *Buraczynski*, 919

S.W.2d at 320. *See also Howell v. NHC Healthcare–Fort Sanders, Inc.*, 109 S.W.3d 731, 733–34 (Tenn.Ct.App.2003); *Pyburn*, 63 S.W.3d at 359. Applying the law to the facts at hand, there is little question but that this is an adhesion contract. The contract is a standardized form, sold by EDSI to its employer-signatories in tear-off pads. (Docket No. 82, Ex. 3, Kramer Dep. at 24–25.) It is provided to potential employees on a "take it or leave it" basis; if they do not sign, they are not considered for employment, and they are not permitted to modify any portion of the Agreement or the Rules.[17]

■ Adhesion contracts, however, are only unenforceable in Tennessee when the terms are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable. *Buraczynski*, 919 S.W.2d at 320; *see also Pyburn*, 63 S.W.3d at 359. The plaintiffs argue that the Agreement is an unenforceable adhesion contract because it is unconscionable. (Docket No. 99 at 41.) The leading case on unconscionability in Tennessee is *Haun v. King*, 690 S.W.2d 869 (Tenn.Ct.App. 1984), which found that a contract is unconscionable when "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Id.* at 872 (quoting *Brenner v. Little Red School House*, 302 N.C. 207, 210, 274

---

**16.** Having found an invalid contract, the court need not consider plaintiffs' argument that EDSI has breached that contract, nor must it address the final inquiry that governs a motion to compel arbitration: whether the statutory claim is within the scope of the agreement.

**17.** James Randolph Hart, who directs the human resources department at Ryan's, testified as follows:

Q. Are potential employees who apply for a position at Ryan's, are they allowed to modify or strike or amend the arbitration agreement or the EDSI rules and procedures if they see something they don't like?
A. They are not.
Q. Or add to it in any way?
A. They are not.
Q. So it's sort of a take it or leave it deal?
A. It is. (Docket No. 82, Ex. 6, Hart Dep. at 73.)

S.E.2d 206 (1981)). *See Trinity Indus., Inc. v. McKinnon Bridge Co.,* 77 S.W.3d 159, 171 (Tenn.Ct.App.2001) (relying on the *Haun* court's articulation of unconscionability); *Overzet v. Bata Corp.,* No. 19, 1990 WL 62842, at *3 (Tenn.Ct.App. 1990) (relying on the *Haun* court's articulation of unconscionability). The court in *Trinity Industries* characterized the unconscionability inquiry in Tennessee as a lumping together of the two showings of procedural unconscionability, which contemplates a lack of meaningful choice on the part of one party, and substantive unconscionability, which contemplates contract terms that are unreasonably harsh. *See Trinity Indus., Inc.,* 77 S.W.3d at 170–71. *Haun* directs courts undertaking an unconscionability inquiry to consider all the facts and circumstances of a particular case and find a contract unconscionable when the provisions of the contract are "so one-sided that the contracting party is denied any opportunity for a meaningful choice." *Haun,* 690 S.W.2d at 872 (quoting *Brenner,* 302 N.C. at 210, 274 S.E.2d 206).

 The case for procedural unconscionability is strong here because many of the hallmarks of procedural unconscionability are present. The applicants are seeking low-wage jobs and many have limited education, while attorneys for EDSI, a corporation, have tailored the Agreement to its needs. Ryan's does not permit potential employees to modify any portion of the Agreement or Rules. Whether or not employees are even provided with a copy (to take home or read before signing the Agreement) of the Rules, which contain material terms that are key to understanding the Agreement, is contested.[18] It is clear, however, that employees are not permitted to meaningfully consider the Agreement for any period of time, as they are required to sign it on the spot or forfeit the opportunity to be considered for employment. Potential employees may confer with an attorney before signing the Agreement, (Docket No. 82, Ex. 4, Agreement ¶ B.2.I), but this is an empty opportunity, given the time constraints on signing and the perceived bad impression that consulting an attorney might engender in the potential employer. Also, there is no provision for employees to unilaterally revoke consent to the agreement after signing it, even if they do not obtain a position at Ryan's.

That the arbitration agreement is a clearly marked, independent agreement that explains in capital letters that parties who sign the Agreement are giving up their right to "litigation in state or federal court" does not materially mitigate the procedural unconscionability of the Agreement. Although it is a discrete document, the Agreement is bundled with other forms in the employment application. Furthermore, "litigation" is not as recognizable a term as "trial" or "jury" to persons of limited education.[19] The defendant argues that employees have the ability to walk away from the bargain, and it is true that employees are most often presented with the Agreement before they have in-

18. As discussed in the factual section of this opinion, there is a dispute between the parties as to whether the Rules are provided along with the application and Agreement.

19. The current agreement adds a provision that states in bold, capital letters: "You waive any right arising under either state or federal law to have your claim resolved by a jury. Rather, any claim you may file will be finally resolved by a panel of three neutral arbitrators." (Docket No. 82, Ex. 4, Agreement ¶ A.2.) However, this waiver language, discussing the unavailability of a jury, is absent from earlier EDSI agreements, including each Agreement signed by the representative plaintiffs. (Docket No. 8, Ex. 1, Walker Agreement; Docket No. 8, Ex. 2, Ricketts Agreement; Docket No. 8, Ex. 3, Atchley Agreement.)

terviewed for the job; thus they have not invested considerable resources in the position. However, the court recognizes that a party searching for minimum wage employment may not be in as favorable a bargaining position as a potential car buyer, for example, who could easily walk away from a deal she finds unacceptable. The court also acknowledges the *Cooper* court's concern that a meaningful choice not to sign such a contract is elusive, given the increasing trend toward mandatory arbitration in employment contexts. *See Cooper*, 199 F.Supp.2d at 778, 778 n. 4. Thus, there is strong evidence of the procedural unconscionability of the Agreement.

When the factors demonstrating procedural unconscionability are combined with a review of the one-sided terms of the Agreement, the court considers this Agreement as a whole to be unconscionable. EDSI is permitted to unilaterally modify the Rules that govern arbitration, with no required input from, notice to, or consent of employees. As discussed above, no provision of the Agreement permits an employee to unilaterally give notice and cancel her obligations under the contract, although EDSI may terminate its obligation at will, correspondent with Ryan's cancellation of its contract with EDSI. The arbitrator selection process detailed in the Rules provides a veneer of employee involvement, but EDSI and the employer entirely construct two of the three pools of potential arbitrators, skewing the arbitration panels towards management. Limitations on discovery heavily burden employees, and the unavailability of class arbitration also works to employees' detriment. These one-sided terms, together with the manifest inequality of the parties' bargaining positions, create an unconscionable contract. Unconscionable contracts of adhesion are unenforceable in Tennessee.

### b. *Mutual Assent*

■ There is strong evidence that the EDSI Agreement did not result from a meeting of the minds in mutual assent between EDSI and potential employees of Ryan's. Under Tennessee law and general contract principles, an enforceable contract must issue from a meeting of the minds of the parties in mutual assent to its terms. *See Higgins v. Oil, Chemical & Atomic Workers*, 811 S.W.2d 875, 879 (Tenn.1991); *see also Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 386 (Tenn.1996). The Tennessee Supreme Court has recognized that courts have moved towards an objective test to determine mutual assent, rather than characterizing their inquiry under the outdated "meeting of the minds" theory, but counsel that it still may be necessary to look beyond the words of the parties to their intent in considering mutual assent. *See Higgins*, 811 S.W.2d at 879. Tennessee courts have generally said that parties who do not read the contracts they sign cannot be heard to complain about the contracts' contents; they may not deny their obligations under those contracts but will be presumed to know their contents. *Pyburn*, 63 S.W.3d at 359. *See also, Giles v. Allstate Ins. Co.*, 871 S.W.2d 154, 156–57 (Tenn.Ct.App.1993) (holding the plaintiff to an insurance application containing incorrect information that she signed despite her failure to read the application); *Teague Bros., Inc. v. Martin & Bayley, Inc.*, 750 S.W.2d 152, 158 (Tenn.Ct.App.1987) (upholding the general rule but noting that the general rule is not applicable when neglect to read was induced by strategem, trick, or artifice by the one seeking to enforce the contract).

Despite the general rule that parties are under a duty to ascertain the contents of contracts they sign and will be held to their obligations, Tennessee courts have at times refused to hold parties to contracts

they have not read. *See, e.g., Howell,* 109 S.W.3d at 735. In *Howell,* the Court of Appeals refused to enforce an arbitration clause in a nursing home admittance agreement against a plaintiff who could not and had not read the contract when the proponent of the contract had taken it upon herself to explain the contract to him, rather than ask him to read it, and had neglected to mention that he was waiving his right to a jury trial under the contract. *Id.* The proponent of the contract had not asked the plaintiff if he could read and did not read the contract to him verbatim; rather, she paraphrased the contents of the agreement. *Id.* at 732. Although the proponent of the contract explained the dispute resolution process discussed therein to the plaintiff and told him that arbitration was binding, the court thought it was crucial that she had not explained that he was waiving the right to a jury trial. *Id.* at 735. Weighing this fact along with circumstances demonstrating that the parties had not bargained over the arbitration

terms and that the clause was not within the reasonable expectations of an ordinary person, the court refused to enforce the arbitration provision. *Id.*

■ The position of the plaintiffs in this case during the signing of their contracts with EDSI is analogous to the position of the plaintiff in *Howell.* The representative plaintiffs did not execute these agreements in mutual assent with EDSI to the contracts' terms. As discussed above, there is a real question as to whether or not the plaintiffs were provided with the Rules when they signed the contracts, which contained material terms of the Agreements. There is also conflicting evidence about whether the parties knew what they were signing at the time they signed it. There is strong evidence, as in *Howell,* that potential employees were given misinformation about the Agreement and the arbitration process and never told they were waiving their right to a trial when the Agreement was explained to them.[20] This evidence leads to the conclu-

20. One of the plaintiffs, Nanella Dukes, describes the explanation she was given: "When I asked what [the packet of documents containing the Agreement was], the General Manager, Monica Head, told me that one of the documents meant that if I ever had any problems with Ryan's or Ryan's management, I had to 'go through Ryan's arbitration.' That was the only explanation he gave me, and I was never told that the 'arbitration' would prevent me from going outside the company to sue in court if Ryan's violated the law." (Docket No. 83, Declaration of Nanella Dukes ¶ 5.) Paul Huether, a manager, explains what he was told to say if questions were asked about the Agreement: "Our supervisors at Ryan's told us during manager meetings with them, that if it came up to tell any job applicant that the arbitration agreement meant that any problems would be handled 'up the chain of command,' and that we would handle problems 'in house' first, and if the problem could not be resolved there, then it would be taken to the supervisor to resolve." (Docket No. 83, Declaration of Paul Huether ¶ 7.) (It is unclear whether Paul Huether is the

same person as one of the plaintiffs, Paula K. Reuther, joined pursuant to Docket No. 61, and if so, which of those spellings is a misspelling.) Julie Oaks describes her experience: "When I asked what they were, the manager told me that one of the documents meant that if I ever had any problems with Ryan's, I had to 'go through Ryan's' before I could go to an attorney. That was the only explanation he gave me ... [I] was never told that these documents might prevent me from suing Ryan's in a court of law ...." (Docket No. 83, Declaration of Julie Oaks ¶ 4.) Sharon Pinckney describes the explanation she was given about the arbitration agreement: "Alan Shaw told me that it would be in my best interest to sign it, that a 'board of my peers' would help decide employment any issues [sic] which arose with Ryan's, and that this was the first step I had to take if I ever wanted to sue Ryan's. Additionally, I was told by Alan Shaw and Phil Franklin that if the dispute was not resolved by a 'board of my peers,' I could still sue Ryan's." (Docket No. 83, Declaration of Sharon Pinckney ¶ 4.)

sion that mutual assent was lacking in the execution of these agreements.

### c. *Waiver of Prospective Claims*

 There is also strong evidence that plaintiffs cannot be compelled to arbitrate their claims because they did not knowingly and voluntarily waive their constitutional right to a jury trial. (Docket No. 99 at 46–47.) The question of waiver of the right to a jury trial is governed by federal, not state, law. *See K.M.C. Co., Inc., v. Irving Trust Co.,* 757 F.2d 752, 755–756 (6th Cir.1985). Plaintiffs rely on the Sixth Circuit's articulation in *Morrison* of the requirements for valid waiver, which in turn relies on an earlier decision of that court, which defined the inquiry into knowing and voluntary waiver as an evaluation of the following factors: "(1) plaintiff's experience, background, and education; (2) the amount of time plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances." *Morrison,* 317 F.3d at 668 (quoting *Adams v. Philip Morris, Inc.,* 67 F.3d 580, 583 (6th Cir.1995)). The defendant unsuccessfully attempts to distinguish the *Morrison* court's articulation of the waiver inquiry. Bound by the Sixth Circuit's en banc decision in *Morrison,* this court will inquire into whether the plaintiffs knowingly and voluntarily waived their right to a jury trial under the factors that the *Morrison* court has articulated.

Based on the profiles of the representative plaintiffs, the experience, background, and level of education of the plaintiffs was low to mid-level. Atchley had only an eighth-grade education when she sought her employment as a server. Walker had a high school education and worked as a manager. Ricketts, who was hired as a server and cook, does not discuss his level of education. Plaintiffs had virtually no time to consider the waiver contained in the arbitration agreement and, although they were afforded the option to contact a lawyer if they chose (a provision underlined in the contracts they signed), this opportunity was not a realistic one, as discussed above. The waiver is relatively explicit in its expression that any and all disputes would be resolved "only through arbitration in the EDSI forum and NOT THROUGH LITIGATION IN STATE OR FEDERAL COURT," with capitalization as noted, but as discussed earlier, the agreement does not use more commonly understood waiver language about foregoing the right to have claims heard at "trial" or by a "jury." (Docket No. 8, Ex. 1, Walker Agreement at 1; Docket No. 8, Ex. 2, Ricketts Agreement at 1; Docket No. 8, Ex. 3, Atchley Agreement at 1.) As discussed at length above, consideration for the waiver of the judicial forum is lacking. Determining whether a valid waiver had been obtained from plaintiffs in view of the totality of the circumstances, the court finds that the plaintiffs did not knowingly and voluntarily waive their right to a jury trial.

### *Conclusion*

Although this court recognizes the liberal federal policy favoring arbitration, it finds that the circumstances of this case preclude submitting these claims to the EDSI arbitral forum. For the reasons stated herein, the defendant's motion to dismiss and petition to compel arbitration and stay proceedings (Docket No. 7) will be denied.

An appropriate order will enter.

### *ORDER*

For the reasons expressed in the accompanying Memorandum, the Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings filed by defendant

Ryan's Family Steak Houses, Inc. (Docket No. 7) is DENIED.

It is so ordered.