IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2003 Session

# LARRY FRANKENBACH v. LARRY ROSE, ET AL.

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 97-4098-I     The Honorable Irvin H. Kilcrease, Jr., Chancellor**

_____

**No. M2002-02073-COA-R3-CV - Filed February 3, 2004**

_____

This appeal arises from a dispute over proceeds from a failed television series. Appellants contracted with the owner of the copyright to handle distribution of the series for which they were to receive a percentage of profits. Owner of the copyright also contracted with Appellees to secure funding for the series with Appellees' obligation limited to $1.6 million in expenses for the series. To that end, Appellees paid vouchers submitted by owner of the copyright, which included payment of agents fees to Appellants. When the $1.6 million cap was reached, Appellees stopped paying vouchers. The owner of the copyright subsequently filed for bankruptcy. Appellants sued Appellees and alleged numerous causes of action in both contract (i.e., oral contract, answering for debt of another, partial performance, promissory estoppel, and The Statute of Frauds) and tort (i.e., fraud, promissory fraud, negligent misrepresentation, tortious interference with contract, interference with business relationship, concert of action/joint enterprise). The trial court granted summary judgment to Appellees on all causes of action. Appellants appeal. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and WILLIAM B. CAIN, J., joined.

G. Thomas Nebel and Suzette Peyton, Nashville, For Appellant, Larry Frankenbach

R. Eddie Wayland and D'Lesli M. Davis, Nashville, For Appellees, Marc Ball, Scene 3, Inc., and STET, L.L.C.

# OPINION

Larry Rose and Daniel Butler came up with the concept for "America's Dumbest Criminals" ("ADC"). Messrs. Rose and Butler created a company, The Entheos Group, LLC ("Entheos").[1] Entheos owned the copyright to ADC. On March 9, 1995, Entheos entered into a "production agreement" with Scene 3, Inc. ("Scene 3") to produce a home video of ADC.[2] Marc Ball is a principal of Scene 3.

Following the creation of the ADC home video, Entheos negotiated with Larry Frankenbach ("Frankenbach") and Andrew Spitzer ("Spitzer," and together with Frankenbach, "Agents," "Plaintiffs," or "Appellants") to procure distribution of ADC.[3] On August 30, 1995, a written memo (the "Entheos/Frankenbach-Spitzer Memo"), outlining the relationship between Entheos and the Agents, was sent to Frankenbach. The memo, which is written on Entheos' letterhead and signed by Messrs. Butler and Rose, reads, in relevant part, as follows:

> ...this letter is confirmation of our acceptance of the general deal points that you and I have been discussing in regard to you [Frankenbach] and Andy [Spitzer] representing the half hour comedy television series "America's Dumbest Criminals" in the syndication marketplace.
>
> The deal points, as we understand them, are:
>
> SCENARIO ONE: Frankenbach-Spitzer Direct Distribution
>
> 1. Base Domestic Distribution Fee: 25% All costs inclusive.
> 2. Profit Participation: 10% in perpetuity based on producers' after production net revenues.
> 3. Foreign, Cable, Telco Arrangements* (Generated by Sub-Distributors): Profit Participation to Frankenbach-Spitzer: 30% (Excluding Home Video)

---

[1] Entheos is a limited liability company organized and existing under the laws of the State of Tennessee, with its principal place of business in Franklin, Tennessee.

[2] Scene 3 is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business located in Nashville, Tennessee.

[3] Spitzer became a party to this case by grant of his May 14, 1999 Amended Motion to Intervene (the original Motion to Intervene was filed on February 16, 1999 ) by Order entered June 15, 1999. On May 14, 1999, Spitzer filed an Amended Proposed Complaint (the original Proposed Complaint was filed on February 26, 1999), which was substantially identical to the First Amended Complaint filed by Frankenbach, *see infra*. On May 1, 2003, Spitzer filed a Motion to Adopt the Brief of Appellant Frankenbach, which was granted by Order entered May 6, 2003.

*Licensing Arrangements was [sic] originally included here as well; we would like to break these out and negotiate them separately. We currently have a licensing agency–Blue Moon Licensing, Ramsey, NJ–under contract to handle licensing deals for publishing and merchandising. They do not have broadcast responsibilities. Before agreeing to pay you a particular percentage on licensing, we need to further discuss how best to define a working arrangement between the parties.

4. Fee for Reruns in Syndication or Cable 20% or 10% Respectively.
5. Distributor to retain final approval for barter ad sales representation.

SCENARIO TWO: Frankenbach-Spitzer Arrange Third Party Distribution (With Producers' [Entheos'] Approval)

1. Year One Finder's Fee: 10%. Fee based on actual production costs per original episode produced.
2. Profit Participation: 10% in perpetuity based on producers' after production net revenues.
3. Foreign, Cable, Telco, or Other View Media (Excluding Home Video) Distributors: 30%[4]

Larry, this is our understanding of the deal points and their current status as recently revised; please let me know if we've missed anything. If not, please indicate your agreement with them below...

Messrs. Frankenbach and Spitzer signed the bottom of this memo after the following language:

The above terms and conditions are consistent with our understanding of the arrangement between Andy Spitzer, Larry Frankenbach, and The Entheos Group, L.L.C. as we discussed them. We agree with them and our signatures represent our willingness to proceed.

On or about June 2, 1996, Marc Ball started the company, STET, L.L.C. ("STET," and together with Scene 3, and Marc Ball "Defendants," or "Appellees").[5] STET was created for the purpose of lending money to Entheos to finance the production of ADC. To this end, an Agreement

---

[4] Scenario Two is the Scenario that actually occurred in this case.

[5] Messrs. Rose and Butler were original Defendants in this case. On July 27, 1999, Plaintiff Frankenbach filed a Notice of Voluntary Dismissal as to Messrs. Rose and Butler. On August 9, 1999, Plaintiff Spitzer also filed a Notice of Voluntary Dismal as to Messrs. Rose and Butler. Rose and Butler were dismissed from the lawsuit by Order entered August 10, 1999. On January 21, 1998, Entheos filed for bankruptcy.

(the "Entheos/STET Agreement") was entered by and between Entheos and STET on July 13, 1996. The Entheos/STET Agreement reads, in pertinent part, as follows:

> **THIS AGREEMENT** ("Agreement") is made and entered into on this 13th day of July, 1996, by and between STET, LLC, ("STET") a Tennessee limited liability company, and The Entheos Group, LLC, ("ENTHEOS") a Tennessee limited liability company.
>
> **WITNESETH:**
>
> **WHEREAS**, ENTHEOS intends to produce twenty-six (26) half-hour, weekly television episodes for a television series titled "America's Dumbest Criminals" (the "Series"); and
>
> **WHEREAS**, ENTHEOS requires financing to produce the Series and STET desires to provide such financing, upon the terms and conditions contained herein;
>
> **NOW, THEREFORE**, in consideration of the foregoing, and the mutual covenants and promises contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:
>
> \*                          \*                          \*
>
> 2.  COMMITMENT TO FUND PRODUCTION EXPENSES. In consideration for the payments to STET set forth in Paragraph 3 below, STET will be irrevocably committed to fund the expenses necessary to produce the Series (the "Production Expenses") in an amount not to exceed a total of One Million Six Hundred Thousand Dollars ($1,600,000).
>
> a.  Production Budget. The entire production budget for the Series shall consist of the combination of an above-the-line budget and a below-the-line budget, copies of which are attached hereto as Schedule "A" and Schedule "B" respectively (collectively the "Budget").[6]
>
> b.  Budget Modifications. Modifications to the Budget shall not be permitted without the written consent of both parties. Notwithstanding the foregoing, either STET or ENTHEOS may modify the Budget provided that such modification does not increase

---

[6] According to Schedule A, the total above-the-line budget for ADC was $976,247. According to Schedule B, the total below-the-line budget for ADC was $1,015,696.80.

either (i) the total budget of One Million Six Hundred Thousand Dollars ($1,600,000) or (ii) the part of the budget, i.e., above-the-line or below-the-line, to which the modification relates.

c. Payment of Production Expenses. Payment of the Production Expenses will be facilitated solely by ENTHEOS and Scene Three, Inc. Submitting vouchers listing itemized expenses to STET. Upon approval of such itemized expenses by an authorized representative of STET, STET will promptly pay such Production Expenses.

3. PAYMENT OF EXPENSES/DIVISION OF PROCEEDS. In consideration for STET's agreement to irrevocably fund the production of the Series, STET shall be paid the amounts set forth below:

a. Division of Proceeds. Prior to any other payment of Gross Receipts to any other party, STET shall receive the following amounts, the priority of which is set forth below:

i. Payment of Production Expenses and Financing Expenses. STET shall be paid out of Gross Receipts any and all amounts advanced pursuant to the terms of this Agreement as Production Expenses, together with interest from the date of each such advancement at the prime rate of interest (on the date of the first advancement) plus two percent (2%) (the "Finance Expense"). STET shall be paid the total amount of the Production Expenses and Financing Expenses out of the Gross Receipts prior to any other payment out of Gross Receipts to any other party for any other purposes.

ii. STET's Share of Gross Receipts. STET shall be paid Thirty Percent (30%) of all remaining Gross Receipts until STET has been paid Two Million Dollars ($2,000,000). After STET has been paid Two Million Dollars ($2,000,000), STET shall receive Fifteen Percent (15%) of the remaining Gross Receipts until STET has been paid an additional One Million Dollars ($1,000,000). After STET has been paid a total of Three Million Dollars ($3,000,000), and except as otherwise provided in this Agreement, STET will not thereafter receive a percentage of any addition Gross Receipts derived from the Series.

Prior to their depositions in this case, the Agents were not aware of the Entheos/STET Agreement. In particular, the Agents were unaware of the $1.6 million cap on the funds STET was required to lend to Entheos, and of the "no oral modifications" clause in the Entheos/STET Agreement. Frankenbach continued to perform under the Entheos/Frankenbach Spitzer Memo. Specifically, Frankenbach represented ADC in the syndicated market, obtained third-party distributors for ADC, and was instrumental in arranging for Active Entertainment and Worldvision to distribute the property. Frankenbach was also involved in arranging international distribution. According to Frankenbach, these activities triggered the compensation provision under "SCENARIO TWO" of the Entheos/Frankenbach-Spitzer Memo, see *supra*.

STET paid to Frankenbach, on checks indicating "on behalf of Entheos," over $30,000 for a portion of the finder's fees component of the Agents' fees contemplated under SCENARIO TWO of the Entheos/Frankenbach-Spitzer Memo. Spitzer received approximately $60,000.00 of the finder's fees component of the Agents' fees. Frankenbach and Spitzer requested that the finder's fee portion of the Agents' fees, the budget portion, be paid to them in a lump sum by STET. STET told Frankenbach and Spitzer that they were not going to be paid, in a lump sum, the finder's fees portion of the Agents' fees under the Entheos/Frankenbach-Spitzer Memo.

By early 1997, Defendants contend that STET had loaned to Entheos, via payments to third parties on the ADC production, the entire $1.6 million required under the Entheos/STET Agreement. Soon after STET paid out the $1.6 million required under the Entheos/STET Agreement, STET stopped writing checks to cover vouchers submitted by Entheos, including vouchers for the finder's fees component of the Entheos/Frankenbach-Spitzer Memo.

Beginning on or about August 7, 1996, Frankenbach had several conversations with Ball concerning the payment of the Agents' fees to Frankenbach and Spitzer on ADC. Spitzer had only one conversation with Ball concerning the payment of these fees. Frankenbach contends that Ball made representations in these conversations that they [Frankenbach and Spitzer] would be paid "all amounts owed." Frankenbach and Spitzer understood Ball to be talking about "all amounts owed" to them under the Entheos/Frankenbach-Spitzer Memo.[7] Although these conversations occurred, any agreement by Ball that he, STET, or Scene 3 would pay the fees owed to Frankenbach and Spitzer by Entheos, under the Entheos/Frankenbach-Spitzer Memo, was never reduced to writing.

It is undisputed that Frankenbach and Spitzer performed their obligations as Agents under the Entheos/Frankenbach-Spitzer Memo. Frankenbach and Spitzer received finder's fees as outlined above. Additionally, Frankenbach received $6,500.00 from Entheos for the international and other distribution component of the Entheos/Frankenbach-Spitzer Memo; Spitzer received two checks from Entheos for the international and other distribution components

---

[7] Specifically, when Frankenbach and Spitzer state that Ball said he would pay all of the money owed, they mean SCENARIO TWO of the August 30, 1995 Entheos/Frankenbach-Spitzer Memo, which includes finder's fees, domestic profit participation and international profit participation.

-6-

of Entheos/Frankenbach-Spitzer Memo. Neither Frankenbach nor Spitzer received any amounts for the domestic profit participation component of the Entheos/Frankenbach-Spitzer Memo.

On December 11, 1997, Frankenbach filed a Complaint in the Chancery Court of Davidson County. The original Complaint was subsequently amended on January 6, 1998. The First Amended Complaint reads, in relevant part, as follows:

### COUNT 1–CONCERT OF ACTION

\*     \*     \*

36. The Counts which follow include allegations of various tortious acts committed by Rose, Butler, Entheos, Ball, Scene 3 and STET. These tortious acts were done in concert and pursuant to a common design to circumvent payment of amounts due Frankenbach and/or to convert such funds for Defendants own use and benefit.

37. Each Defendant substantially assisted in accomplishing a tortious result in regard to Frankenbach by compelling execution of a contract which unlawfully attempts to transfer or interfere with rights of Frankenbach without his knowledge, consent or waiver and for otherwise diverting and/or converting funds appropriated and due Frankenbach to their own use and benefit.

38. The concerted tortious actions of each Defendant are a direct and proximate cause of the injuries to Frankenbach.

\*     \*     \*

40. The tortious conduct of Ball which is a direct and proximate cause of injuries to Frankenbach is imputable to Scene 3 and STET, thus Ball, Scene 3 and STET are jointly and severally liable for their tortious conduct.

### COUNT II–JOINT ENTERPRISE

\*     \*     \*

42. Defendants, Rose, Butler, Entheos, Ball, Scene 3 and STET engaged in a joint enterprise for their financial gain in which their common purpose was [to] deprive Frankenbach of all sums due him resulting in financial gains for all Defendants.

43. Rose, Butler, Entheos, Ball, Scene 3 and STET had some manner of agreement concerning the joint enterprise as evidenced by the facts that Ball and/or Scene 3, through STET, financed the first annual budget to produce ADC; Ball and/or Scene 3 provided services to Rose, Butler and Entheos and received payment therefor; Ball and/or Scene 3 controlled all payments of obligations in connection with ADC; and engaged in other conduct with the purpose of depriving Frankenbach of all sums due him.

44. Each Defendant, individually and otherwise, had the right to control and/or affect the control of the venture.

45. In furtherance of the joint enterprise, Rose, Butler, Entheos, Ball, Scene 3 and STET were guilty of tortious conduct toward Frankenbach which was a direct and proximate cause of injuries to Frankenbach, thus they are jointly and severally liable for their tortious conduct.

\*                              \*                              \*

## COUNT IV–FRAUD

\*                              \*                              \*

58. Defendants failed and/or refused to notify Frankenbach that his rights may be affected by the contract ultimately executed between Entheos and STET.

59. When Frankenbach learned of the existence of the contract, Defendants, each and collectively, promised Frankenbach that the agreement would not affect the existing obligations and timely payment therefor to Frankenbach.

60. Further, Ball, individually and on behalf of Scene 3, promised to Frankenbach that the money due him for the finder's fee had been appropriated and that he would receive his full share of the finder's fee....

61. In addition, Ball, individually and on behalf of Scene 3, promised to Frankenbach that the money due him from foreign revenues would be paid to him upon receipt....

62. Defendants knew the foregoing representations were false inasmuch as Defendants intended to pay only so much of the sums due Frankenbach as they deemed necessary to delay legal action by Frankenbach until such time as the STET was without assets to meet this obligation.

63. Frankenbach believed and relied upon the representations of Defendants.

64. In reliance thereon, Frankenbach did not demand payment in full or take judicial action to enjoin Defendants from misappropriating and/or converting the appropriated funds to their own use and benefit.

65. Defendants made or caused to be made sporadic installment payments for the finder's fee to Frankenbach in furtherance of their scheme.

66. As a result, Frankenbach has suffered substantial damage in that the appropriated funds have been misappropriated and Defendants have been permitted to convert and/or misappropriate foreign revenues due Frankenbach.

67. Consequently, Defendants should be determined to be jointly and severally liable to Frankenbach for any and all amounts owed, including costs and expenses.

## COUNT V–PROMISSORY FRAUD

\*                              \*                              \*

69. Defendant Ball, individually and on behalf of Scene 3, promised to pay to Frankenbach all sums due him under the terms of the agreement between Rose, Butler, Entheos and Frankenbach as consideration for his agreement not to interfere with the contract entered between Entheos and STET....

70. It was understood and agreed that the amount due Frankenbach for finder's fee totaled $98,750.00. The funds due Frankenbach from foreign revenues could not be determined with specificity, however, it was anticipated that this amount would approximate at least $100,000.00.

71. All the while, Ball, neither individually nor as a representative of Scene 3, had no present intent to perform the promises made to Frankenbach.

72. Neither Ball nor Scene 3 has performed as promised despite demands by Frankenbach that they do so.

73. Consequently, Ball and Scene 3 should be determined to be jointly and severally liable to Frankenbach for any and all amounts owed, including costs and expenses.

## COUNT VI–NEGLIGENT MISREPRESENTATION

\*                                      \*                                      \*

75. Defendants falsely and negligently represented to Frankenbach that he would receive $98,750.00 appropriated for payment to him as a finders fee as well as all sums due him from foreign revenues.

76. Defendants falsely and negligently represented to Frankenbach that the orchestrated agreement between Entheos and STET would have no effect on payments due him or the timely payment thereof.

77. In addition, Defendants failed to disclose material facts which they knew or should have known would impact Frankenbach's relative to protecting his rights.

78. The foregoing actions and/or inaction of Defendants were intended to persuade Frankenbach that it was unnecessary to take legal action to protect his rights.

79. Defendants knew or should have known that Frankenbach would rely upon these representations.

80. Frankenbach relied upon the representations and has been injured as a proximate result.

81. Consequently, Defendants should be determined to be jointly and severally liable to Frankenbach for any and all amounts owed, including costs and expenses.

## COUNT VII–TORTIOUS INTERFERENCE

\*                                    \*                                    \*

83. When the contract was entered between Entheos and STET, Rose, Butler and Entheos were parties to a legally enforceable agreement between Frankenbach and them which set forth in plain terms the specific rights and responsibilities thereunder.

84. All Defendants, individually and collectively, were aware of the existence, including all terms, of the agreement between Frankenbach, Rose, Butler and Entheos.

85. Notwithstanding, Ball and Scene 3, intentionally and maliciously induced Rose and Butler to permit Entheos to enter a contract with Ball and/or Scene 3 d/b/a STET with the intent and result of inducing Butler, Rose, and Entheos to breach the contract with Frankenbach.

86. Frankenbach has been injured as a proximate result.

87. Consequently, Defendants should be determined to be jointly and severally liable to Frankenbach for any and all amounts owed, including costs and expenses.[8]

On February 6, 1998, STET, Ball, and Scene 3 filed their respective Answers to the First Amended Complaint denying liability.[9] On January 28, 1999, STET, Ball, and Scene 3 filed motions to amend their affirmative defenses to Frankenbach's First Amended Complaint. These motions were granted by Order entered February 16, 1999. The Defendants' Amended Affirmative Defenses were entered into the record by Order of February 17, 1999. These Amended Affirmative Defenses read, in pertinent part, identically except for the respective Defendant's name:

1. The First Amended Complaint fails to state a claim upon which relief can be granted.

---

[8] We note that Frankenbach and Spitzer aver other claims, including Conversion and Accounting, in the First Amended Complaint. However, no issues regarding these causes of action were raised on appeal.

[9] Also on February 6, 1998, Scene 3, STET, and Ball each filed a Cross-Complaint against Messrs. Rose and Butler. Certain of these claims were dismissed by the trial court upon grant of Messrs. Rose and Butler's March 19, 1998 Motion for Partial Summary Judgment by Order of April 30, 1998. The remainder of the claims against Messrs. Rose and Butler were voluntarily dismissed by the Defendants.

2.  Any damage with respect to which a claim is asserted against Defendant [Scene 3, Ball, and STET] has resulted from acts, omissions, or events other than any alleged acts or omissions of [Scene 3, Ball, and STET].

3.  The claims in the First Amended Complaint are barred, in whole or in part, by the doctrine of "unclean hands."

4. [Frankenbach] is estopped by his own actions, conduct, or omissions from asserting some or all of the claims included in his First Amended Complaint.

5. [Frankenbach] has failed to take reasonable steps to mitigate his alleged damages and, therefore, may not recover any alleged damages that could have been avoided.

6.  The claims in the First Amended Complaint are barred by the terms of the Agreement referenced in Paragraph 19 of the First Amended Complaint [The Entheos/STET Agreement ]....

7.  The claims in the First Amended Complaint are barred by a failure of consideration.

8.  The claims in the First Amended Complaint are barred by failure of a condition precedent.

9.  Some or all of the claims in the First Amended Complaint are barred by the doctrine of estoppel.

10.  Some or all of the claims in the First Amended Complaint are barred by the doctrine of waiver.

11.  Some or all of the claims in the First Amended Complaint are barred by the applicable statute of limitations.

12.  The claims in the First Amended Complaint are barred by the Statute of Frauds.

*                              *                              *

14.  The claims in the First Amended Complaint are barred by the doctrine of Res Judicata.

On August 27, 1999, Scene 3, STET, and Ball filed a Motion to compel discovery and for sanctions against Messrs. Spitzer and Frankenbach. Spitzer and Frankenbach responded to this Motion of September 7, 1999. By Order of May 23, 2000, the trial court ordered the parties to complete discovery by April 21, 2000 and to either dispose of the case or have it set for trial by June 23, 2000. Frankenbach and Spitzer filed separate Motions to Set on June 23, 2000. Spitzer also filed a "Motion to Extend Scheduling Order" on June 23, 2000. STET, Scene 3, and Ball filed a "Response to Motion to Set and Motion to Extend Scheduling Order" on July 7, 2000, in which they agreed to Plaintiffs' Motion to Set but opposed the Motion to Extend Scheduling Order.

On August 31, 2000, the trial court entered an Order dismissing the case for failure to prosecute. On September 25, 2000, Spitzer and Frankenbach filed separate motions asking the trial court to alter its Order dismissing their lawsuit. The Defendants' filed their opposition to Plaintiffs' motions to alter; however, by Order of November 3, 2000, the trial court set aside its Order of dismissal. On February 6, 2001, the court entered an Order, mandating that, on or before March 7, 2001, the case be set for trial or dismissed. On February 16, 2001, Frankenbach and Spitzer filed respective motions to set the case for trial and the case was ultimately set for trial on May 6, 2002.

On February 28, 2002, STET, Ball, and Scene 3 filed a joint Motion for Summary Judgment against Spitzer and Frankenbach, along with a Statement of Undisputed Material Facts, and Memoranda of Law in support thereof. On June 24, 2002, Spitzer filed his Statement of Undisputed Material Facts and Response to the Defendants' Motion for Summary Judgment. On June 24, 2002, Frankenbach filed his "Responses to Defendants' Marc Ball, Scene 3, and STET Statement of Undisputed Material Facts as to which there is no genuine issue for trial," and a "Separate Statement of Additional Material Facts in Opposition to Motion for Summary Judgment." By Response entered July 19, 2002, STET, Ball, and Scene 3 "admit[ted] all Additional Material Facts for purposes of Summary Judgment Motion only."

A hearing on the Motion for Summary Judgment was held on July 19, 2002. Defendants' Motion was granted by Order entered July 22, 2002. Frankenbach and Spitzer filed separate Notices of Appeal on August 6, 2002 and August 26, 2002 respectively. On May 1, 2003, Spitzer filed a Motion to Adopt the Brief of Appellant Frankenbach, which was granted by Order entered May 6, 2003. Appellants Spitzer and Frankenbach raise two issues for review as stated in their brief:

> 1. Did the trial court err in dismissing plaintiffs' contract claims?
> a. Did the trial court err in determining that Frankenbach did not have a contract with defendants?
> b. Did the trial court err in determining that partial performance by both plaintiff and defendants failed to abrogate the Statute of Frauds?

c. Did the trial court err in determining that the Statute of Frauds defeated Frankenbach's proprietary marketing rights in "America's Dumbest Criminals"?

d. Did the trial court err in determining that the marketing agreement lacked sufficient specificity to provide a remedy for breach?

2. Did the trial court err in dismissing plaintiffs' tort claims on the basis of the Statute of Frauds?

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id*. In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id*. at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding the trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

## Contract Claims

At the core of their contract claims, Frankenbach and Spitzer assert that Marc Ball, acting individually and/or on behalf of STET and/or Scene 3, promised the Agents that they would be paid the fees due them under the Entheos/Frankenbach-Spitzer memo. The alleged promise by Ball is not, however, in writing–a fact that is undisputed in the record. We quote from

"Plaintiff's Responses to Defendants' Marc Ball, Scene 3, and STET Statement of Undisputed Material Facts as to which there is No Genuine Issue for Trial"(the "Responses"):

> 29. Frankenbach and Spitzer admit that they have no written agreement with anyone but Entheos to pay them fees relating [to] ADC.
>
> RESPONSE:
>
> Admit
>
> 30. Frankenbach and Spitzer admit they do not have any written contract with Ball, Scene 3, or STET for the payment of agents' fees relating [to] ADC.
>
> RESPONSE:
>
> Admit
>
> 31. Specifically, Frankenbach and Spitzer admit there is no written agreement in which STET, Scene 3 or Ball assume the agents' fees obligations of Entheos to Frankenbach or Spitzer.
>
> RESPONSE:
>
> Admit

Since there is no written agreement between the parties, Frankenbach and Spitzer advance several theories in support of their contention that a separate, enforceable agreement exists outside the Statute of Frauds, which obligates Ball, STET, and/or Scene 3 to pay their Agents' fees.

Frankenbach and Spitzer first assert that summary judgment was not warranted because a reasonable jury could conclude that Ball's actions, for his own part and on behalf of the corporations he controlled, gave rise to a separate agreement regarding payment of Frankenbach and Spitzer's fees. It is undisputed in the record that Ball had several (although the exact number is disputed) conversations with Frankenbach and/or Spitzer, concerning payment of fees due them under the Entheos/Frankenbach-Spitzer Memo. Again, we quote from the Responses:

> 64. Frankenbach had three conversations with Ball concerning the payment of agents' fees to Frankenbach and Spitzer on ADC, the first of which Spitzer also attended.

-15-

RESPONSE:

Deny. Frankenbach had a number of conversations with Ball, but did not know the precise number.

65. Spitzer had only the one conversation with Ball concerning the payment of agents' fees to Frankenbach and Spitzer on ADC.

RESPONSE:

Admit

66. Frankenbach and Spitzer acknowledge that they cannot recall Ball's exact words in the first conversation with Ball concerning agents' fees.

RESPONSE:

Deny. Plaintiff states that Marc Ball told him that Scene 3, Marc Ball, and anyone associated with that production will not renege on any obligation.

*                              *                              *

70. In each of the conversations between Frankenbach and Ball concerning the ADC agents' fees, Ball said: (1) Scene 3, Marc Ball, and anybody associated with the ADC production would not renege on any obligation; and (2) Frankenbach and Spitzer would get all amounts owed.

RESPONSE:

Deny to the extent the statement seeks to limit precisely or to characterize what was said in the numerous conversations Frankenbach had with Ball concerning Agent's fees.

*                              *                              *

76. In the first conversation with Frankenbach and Spitzer concerning agents' fees relating to ADC, Ball stated to Frankenbach and Spitzer that: (1) they would get all money owed; (2) they would not receive a lump sum payment; (3) his reputation and Scene 3's reputation required that everything that was owed be paid; (4) his

-16-

reputation and Scene 3's reputation was that "I pay everything that I am responsible to pay["]; and (5) that he would not put the preceding statements in writing.

RESPONSE:

Admit

Concerning these facts, Frankenbach and Spitzer first assert that the conversations they had with Ball resulted in an oral contract, which obligated Ball personally and/or STET and Scene 3 (the companies that he controlled) to pay their fees independent of the Entheos/Frankenbach-Spitzer Memo (i.e. an oral contract was formed between Ball, STET, and/or Scene 3 and Frankenbach and Spitzer wherein Ball (individually or as an authorized agent of STET and/or Scene 3) agreed to pay agent's fees associated with ADC). In the alternative, Frankenbach and Spitzer assert that these conversations obligated Ball personally and/or STET and Scene 3 to pay any fees due them under the Entheos/Frankenbach-Spitzer Memo (i.e. that, by his words, Ball agreed to answer for the debt of Entheos).

## Oral Contract

A contract has been defined over the years as an agreement, upon sufficient consideration, to do or not to do a particular thing. **Smith v. Pickwick Electric Cooperative**, 367 S.W.2d 775, 780 (Tenn. 1963). A party attempting to prove the existence of a contract "is required to show that the agreement on which he relies was supported by adequate consideration ..." **Price v. Mercury Supply Co., Inc**., 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984). "[I]n all simple contracts...whether written or verbal, the consideration must be averred and proved." **Clark v. Small**, 14 Tenn. (6 Yer.) 418, 421 (1834); **see also** 17 Am.Jur.2d *Contracts* § 125 (1965) and 17 CGS *Contracts* § 116 (1963).

The question of what constitutes consideration adequate or sufficient to support a contract has been addressed by a number of Tennessee courts. The court in **University of Chattanooga v. Stansberry**, 9 Tenn.App. 341, 343 (1928) defined consideration as "either a benefit to the maker of the promise or a detriment to, or obligation upon the promise[e]" (citing **Foust v. Board of Education**, 76 Tenn., (8 Lea), 552). Courts have been willing to find a contract based on facts from which a jury could infer the requisite consideration. In **Palmer v. Dehn**, 198 S.W.2d 827 (Tenn. Ct. App. 1946), this Court said:

> For there to be a consideration in a contract between parties to the contract it is not necessary that something concrete and tangible move from one to the other. Any benefit to one and detriment to the other may be a sufficient consideration. The jury may draw any reasonable and natural inference from the proof and if by inference from the proof a benefit to the promisor and detriment to the promisee might be inferred this will constitute a valid consideration.

-17-

*Id.* at 828; *see also Robinson v. Kenney*, 526 S.W.2d 115, 118-19 (Tenn. Ct. App. 1973); *Trailer Conditioners, Inc. v. Huddleston*, 897 S.W.2d 728, 731 (Tenn. Ct. App. 1995).

In addition to the benefit/detriment paradigm, Tennessee courts have defined valid consideration in terms of the promisee's legal rights and obligations. "Consideration [exists] when the promisee does something that he is under no legal obligation to do or refrains from doing [that] which he has a legal right to do." *Kozy v. Werle*, 902 S.W.2d 404, 411 (Tenn. Ct. App. 1995) (citing *Brown Oil Co., Inc. v. Johnson,* 689 S.W.2d 149 (Tenn. 1985)).[10]

In the instant case, the question of whether an oral contract exists between Ball, STET and/or Scene 3 and Frankenbach and Spitzer rests on the issue of consideration. Regardless of the content of the conversations that passed between the parties, under the authority outlined above, no contract can exist independent of consideration. Frankenbach and Spitzer assert that Ball promised to pay the fees owing for the sale of ADC and that, in reliance upon these assurances, Frankenbach and Spitzer provided consideration for the new agreement by "accepting installment payments instead of the lump-sum payment out of the production budget to which they were entitled." From our reading of the entire record in this case, we can find no evidence from which we can conclude, by inference or otherwise, that Frankenbach and Spitzer were entitled to a lump-sum payment of their fees. Neither the Entheos/Frankenbach-Spitzer Memo nor the Entheos/STET Agreement, nor anything that Ball allegedly said gives Frankenbach and Spitzer the legal right to a lump sum payment of fees:

> 116. In all of Frankenbach's conversations with Ball, Ball said that Frankenbach would be paid in installments, but Ball never discussed Frankenbach's position in line for such payments.
>
> RESPONSE:
>
> Admit
>
> 117. Frankenbach and Spitzer admit that there is nothing in writing that indicates Frankenbach or Spitzer were to be paid before other entities were to be paid.
>
> RESPONSE:
>
> Admit for purposes of this motion only.

In addition, Frankenbach and Spitzer admit to a lack of consideration in their Responses:

---

[10] The Supreme Court of Tennessee held that "[b]y foregoing its legal right to collection by levy, the Department of Revenue refrained from doing something it had a legal right to do and, therefore, the assumption of liability agreement was supported by consideration." *Brown Oil Co.*, 689 S.W.2d at 151.

90. At the time that they began having conversations with Ball concerning the payment of agents' fees, Frankenbach and Spitzer had already done what they were supposed to do under the Entheos/Frankenbach-Spitzer memo, date August 30, 1995.

RESPONSE:

Admit

91. Frankenbach and Spitzer admit that they never promised Ball anything in return for Ball's promise to pay them amounts owed under the Entheos/Frankenbach-Spitzer memo dated August 30, 1995.

RESPONSE:

Admit for the purposes of this motion only, except to the extent that it calls for a legal conclusion.

92. Frankenbach and Spitzer admit that, in return for Ball's promise to pay them amounts owed them by Entheos, Frankenbach and Spitzer never agreed to do anything additional to what they had already done under the Entheos/Frankenbach-Spitzer memo, dated August 30, 2995.

RESPONSE:

Admit for the purposes of this motion only, except to the extent that it calls for a legal conclusion.

For the foregoing reasons, we conclude there is no oral contract between the parties due to a lack of consideration.

Answering for the debt of another, Partial Performance, Promissory Estoppel, and The Statute of Frauds

The next scenario propounded by Appellants is that, through his actions and statements, Ball agreed to answer for Entheos' debt (as outlined in the Entheos/Frankenbach-Spitzer Memo). The Statute of Frauds is a well know rule of law that forbids a plaintiff from maintaining certain types of contract actions without a written note or memorandum of the alleged agreement, signed by the party to be charged. In this state, the Statute of Frauds is found at T.C.A. § 29-1-101 (2000), and provides, in pertinent part, as follows:

**29-2-101.  Writing required for action**–(a) No action shall be brought:

\*                                \*                                \*

(2) To charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person . . .  unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

Although the Statute of Frauds clearly requires any agreement to answer for the debt of another to be in writing, Frankenbach and Spitzer assert that Ball's partial performance of his promise negates the writing requirement.

Tennessee's Statute of Frauds (as well as those of other states) is patterned after the English Law, which was enacted in 1677 as "the Statute for the Prevention of Frauds and Perjuries." *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924 (Tenn. Ct. App. 1984). Experience has shown that the Statute itself can sometimes be turned into an instrument of the very types of evil it was designed to limit or prevent. *Southern States Development Co., Inc. v. Robinson*, 494 S.W.2d 777 (Tenn. Ct. App. 1972).  To deal with this danger, the courts have developed the equitable doctrine of partial performance, which in Tennessee can be applied to all types of oral contracts except those for the sale of land. *See Schnider v. Carlisle Corp.*, 65 S.W.3d 619 (Tenn. Ct. App. 2001); *Baliles v. Cities Service, Co.*, 578 S.W.2d 621 (Tenn. 1979).

In *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659 (Tenn. 1983), [11] our Supreme Court clarified the equitable nature and limited the purpose of the partial performance doctrine, stating:

This doctrine of partial performance to take the verbal contract out of the operation of the Statute of Frauds is purely an equitable doctrine and is a judicial interpretation of the acts of the parties to prevent frauds.  The acts of the appellant relied on as partial performance had been done by him in pursuance to the averred contract and agreement and are clearly referable thereto.  "The plaintiff must be able to show

---

[11] The doctrine of part performance was used by the court in *Blasingame* to enforce an oral contract where, over a period of years, "the plaintiff was led to believe that the oral employment contract he made with defendant corporation would be honored; that in reliance thereon, plaintiff proceeded to perform his part of the bargain; and that in doing so, he so altered his position as to suffer an unconscionable loss if the corporation was allowed to rely on the Statute of Frauds.  There is material evidence in this record to support those concurrent factual findings and they are binding on this Court." *Id.* at 663.  The Supreme Court found that such facts brought the plaintiff within the exception of part performance, and the plaintiff thereby avoided the Statute of Frauds. *Id*.

> such acts and conduct of the defendant as the court would hold to amount to a representation that he proposed to stand by his agreement and not avail himself to the statute to escape its performance; and also that the plaintiff, in reliance on this representation, has proceeded, either in performance or pursuance of his contract, so far to alter his position as to incur an unjust and unconscious injury and loss, in case the defendant is permitted after all to rely upon the statutory defense."
> 49 Am.Jur. § 427, page 733.

*Id.*, at 633 (quoting *Buice v. Scruggs Equipment Co.*, 250 S.W.2d 44, 48

(Tenn. 1952)).

Other than outlining the equitable nature and limited purpose of the partial performance doctrine, our Tennessee courts have not articulated definite standards for determining the nature or magnitude of the performance that is necessary to bring an oral contract out of the statute of frauds, other than to say that it depends upon the particular facts of each case. *Schnider v. Carlisle Corp.*, 65 S.W.3d 619 (Tenn. Ct. App. 2001); *Foust v. Carney*, 329 S.W.2d 826 (Tenn. 1959). It makes sense, however, that if the doctrine is too liberally applied, it could easily result in the exception of partial performance swallowing the rule of the Statute of Frauds, and allowing the proliferation of those very problems that the Statute of Frauds was enacted to guard against.

In the instant case, Frankenbach and Spitzer admit that, at the time they began having conversations with Ball concerning the payment of agents' fees, they had already done what they were supposed to do under the Entheos/Frankenbach-Spitzer Memo. In short, Frankenbach and Spitzer had completely performed. The Agents' performance, therefore, was not undertaken "in pursuance to the averred contract [that alleged to exist between Ball and Frankenbach and Spitzer]." *Blasingame*, 654 S.W.2d at 663. Rather, Frankenbach and Spitzer's performance was done pursuant to the Entheos/Frankenbach-Spitzer Memo. The fact that Frankenbach and Spitzer did not alter their position (i.e. undertake further actions) subsequent to Ball's alleged agreement to answer for Entheos' debt, should, by itself, take this matter out of the doctrine of partial performance. However, even if we rely only upon the actions of Ball himself, as evidence of partial performance, we reach the same conclusion. Ball's actions in paying Frankenbach and Spitzer, via checks drawn on his company STET, evidence performance of his obligations under the Entheos/STET Agreement only. Had Ball continued to pay vouchers, after reaching the $1.6 million cap, that may have proved his willingness to answer for Entheos' debts. However, the facts clearly show that Ball stopped writing checks when the $1.6 million was paid. From the facts in record, we find that neither the actions of Frankenbach or Spitzer nor the actions of Ball evidence partial performance in pursuance to any alleged contract between these parties.

Frankenbach and Spitzer also rely upon the doctrine of promissory estoppel as an exception to the Statute of Frauds. Promissory estoppel is explained as:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Amacher v. Brown-Forman Corp*., 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991) (quoting *Restatement (Second) of Contracts* § 90); *see also Alden v. Presley*, 637 S.W.2d 862, 862 (Tenn. 1982).

There are, however, limits to the application of promissory estoppel:

Detrimental action or forbearance by the promisee in reliance on a gratuitous promise, within limits constitutes a substitute for consideration, or a sufficient reason for enforcement of the promise without consideration. This doctrine is known as promissory estoppel. A promisor who induces substantial change of position by the promisee in reliance on the promise is estopped to deny its enforceability as lacking consideration. The reason for the doctrine is to avoid an unjust result, and its reason defines its limits. No injustice results in refusal to enforce a gratuitous promise where the loss suffered in reliance is negligible, nor where the promisee's action in reliance was unreasonable or unjustified by the promise. The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonably in justifiable reliance on the promise as made.

*Alden* 637 S.W.2d at 864 (citing L. Simpson, Law of Contracts §61(2d ed. 1965)).

The doctrine of promissory estoppel is also referred to as "detrimental reliance" because the plaintiff must show not only that a promise was made, but also that the plaintiff reasonably relied on the promise to his detriment. *Engenius Entertainment, Inc. v. Herenton*, 971 S.W.2d 12, 19-20 (Tenn. Ct. App. 1997) (citing *Foster & Creighton Co*. *v. Wilson Contracting Co.*, 579 S.W.2d 422, 427 (Tenn. Ct. App. 1978)); and *Quake Constr., Inc. v. American Airlines*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 1004 (1990). Furthermore, the promise upon which the promisee relied must be unambiguous and not unenforceably vague. *Amacher*, 826 S.W.2d at 482.[12] However, a "claim of promissory estoppel is not dependent upon the existence of an

___

[12] Courts have not reached a uniform standard to determine if the promisor's words and actions justify the promisee's reliance. Some courts require that the promise be "definite and unequivocal," while other courts will allow
(continued...)

express contract between the parties." *Engenius Entertainment*, 971 S.W.2d at 19 (citing *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73-74 (2d Cir. 1989)); *United Magazine Co. v. Prudential Ins. Co.*, 877 F. Supp. 1076, 1084-85 (S.D. Ohio 1995); *Quake Constr., Inc. v. American Airlines*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 1004 (1990). The court in *Engenius Entertainment, Inc.* held that the trial court erred in dismissing the plaintiff's promissory estoppel claim where the complaint alleged that defendant made a promise which they reasonably should have expected to induce action by the plaintiff, that plaintiff did take such action induced by the promise, and that plaintiff relied on the promise to his detriment. *Id*. at 20.

The gravamen of this issue is whether Frankenbach and Spitzer suffered any financial detriment because they reasonably relied upon Ball's alleged promise to pay what was due them under the Entheos/Frankenbach-Spitzer Memo. We find that they did not. Even if we allow that Ball promised to pay the Agents all they were owed under their contract with Entheos, we find no evidence to suggest that Frankenbach and Spitzer's reliance upon such promise resulted in pecuniary loss. There are several reasons for this finding.

First, as discussed *supra*, there is nothing in the Entheos/Frankenbach-Spitzer Memo or in the Entheos/STET Agreement to indicate Frankenbach and Spitzer's position in line for payment. Second, there is no hard evidence to suggest that ADC earned domestic or international profits so as to trigger the domestic profit and/or international profit participation components of the Entheos/Frankenbach-Spitzer Memo, to wit:

> 124. Frankenbach and Spitzer have never received any amounts for the domestic profit participation component of the agents' fees; probably because Entheos did not make a profit on ADC prior to filing for bankruptcy.
>
> RESPONSE:
>
> Admit that no domestic profits were ever received, although plaintiff never states anything regarding the profitability of ADC in the domestic market.

Finally, the fact that Entheos filed for bankruptcy on January 21, 1998 and the fact that Frankenbach and Spitzer each filed proofs of claims as general, unsecured creditors in the Entheos bankruptcy do not support a finding that the Agents received less money from their participation in ADC than they would have received had Ball never made any promises to pay. In short, there is nothing in this record to indicate that Frankenbach and Spitzer suffered a detriment because they relied upon anything that Ball might have said:

---

[12](...continued)
the promise to be inferred from general statements of the promisor. *Amacher*, 826 S.W.2d at 482 (citations omitted).

128.  Frankenbach and Spitzer received money for their work on ADC from other sources besides Entheos.

RESPONSE:

Admit

129.   Frankenbach received $50,000 from Worldvision; Spitzer received $43,000 from Worldvision.

RESPONSE:
Admit

130.  Frankenbach and Spitzer also received money from Active Entertainment for work on ADC; Frankenbach cannot recall how much money he received from Active Entertainment, but Spitzer recalls receiving $60,000.

RESPONSE:

Admit

We find, therefore, that summary judgment was appropriate on the contract claims asserted by Frankenbach and Spitzer.  Specifically, we find as follows: (1) there is no written contract between Frankenbach and Spitzer and Ball, STET and/or Scene 3, (2) there is no separate, enforceable oral contract between the parties, obligating Ball or his companies to pay Frankenbach and Spitzer any monies, (3) any promise made by Ball is a promise to answer for the debt of Entheos and thereby subject to the Statute of Frauds, (4) the requirements for partial performance are not met under the facts of this case and so that doctrine does not negate the Statute of Frauds, and (4) the requirements for promissory estoppel are not met under the facts of this case and so that doctrine does not negate the Statute of Frauds.

We now turn to the question of whether summary judgment was appropriate in relation to the tort claims propounded by Frankenbach and Spitzer.

Fraud and Promissory Fraud

In order to state a claim for fraud, the following elements must be established: (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation['s] falsity–that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation relates to an

-24-

existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise." ***Shahrdar v. Global Hous., Inc***., 983 S.W.2d 230, 237 (Tenn. Ct. App.1998) (quoting ***Stacks v. Saunders***, 812 S.W.2d 587, 592 (Tenn. Ct. App.1990)).

In ***Southern States Development Co., Inc. v. Robinson***, 494 S.W.2d 777 (Tenn. Ct. App. 1972), this Court said:

> In equity cases, Tennessee has always recognized that frauds of a certain character will be relieved against even in face of the Statute. This is so because the mind of man is infinite in its contrivances. No matter what laws are written for the purpose of preventing frauds, in time, man will discover some way to use the very law established to prevent frauds to protect one. Equity abhors fraud to such extent that new rules will be created or new exceptions to old rules will be announced, if there is no other way to prevent the reward of a fraud caused by a new and different scheme perpetrated for the same old end. However, no new rule or new exception to an old rule need be promulgated to take this case out of the Statute. In our opinion, this case falls squarely within the exception to the Statute as expressed by the Supreme Court of this state in 1847 in the case of ***Hackney v. Hackney***, 27 Tenn. (8 Humphreys) 452.
>
> In the ***Hackney*** case, supra, in discussing the type of fraud which takes the case out of the statute, the Court stated:
>
>> "the fraud spoken of which will take a case from within the operation of the statute of frauds and perjuries is not fraud in making the promise with no intention of complying with it; but a fraud by which the reduction of it to writing is prevented, the parties so intending; and the complaining party being induced to believe that it has been done, and this fraud may be perpetrated in two ways - ***one by signing a false paper, at the time inducing the belief that it is the true one,*** and the other by inducing the belief that the paper had been signed when in fact it had not." (emphasis ours)

494 S.W.2d at 781-82.

The record in this case indicates that Ball never promised that any agreement between the parties would be or had been reduced to writing:

75. Frankenbach and Spitzer admit that Ball consistently refused to put in writing that he, STET, or Scene 3 would pay the fees owed to Frankenbach and Spitzer by Entheos.

RESPONSE:

Admit

76. In the first conversation with Frankenbach and Spitzer concerning agents' fees relating to ADC, Ball stated to Frankenbach and Spitzer that...he [Ball] would not put the preceding statements in writing.

RESPONSE:

Admit

In short, Ball did not misrepresent the fact that he would not put anything he allegedly promised into writing.

Negligent Misrepresentation

In **Robinson v. Omer**, 952 S.W.2d 423 (Tenn.1997), our Supreme Court discussed the essential elements of a negligent misrepresentation action filed against a professional:

> Tennessee has adopted Section 552 of the *Restatement (Second) of Torts* "as the guiding principle in negligent misrepresentation actions against other professionals and business persons." **Bethlehem Steel Corp. v. Ernst & Whinney**, 822 S.W.2d 592, 595 (Tenn.1991). Section 552 provides, in pertinent part, as follows:
>
>> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

-26-

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Restatement (Second) of Torts, § 552* (1977) (emphasis added).

> In discussing the requirements for recovery under Section 552, this Court has stated that liability in tort will result, despite the lack of contractual privity between the plaintiff and defendant, when,
> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and
> (2) the defendant supplies faulty information meant to guide others in their business transactions; and
> (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and
> (4) the plaintiff justifiably relies upon the information.
> *John Martin Co.*, 819 S.W.2d at 431 (emphasis added); *accord Ritter*, 912 S.W.2d at 130.

*Robinson*, 952 S.W.2d at 427.

Again, as we discussed *supra* at the contract section of this opinion, any detriment that Frankenbach and Spitzer may have suffered because of Ball's alleged representations is not evidenced by the record. Among other things, the record contains no evidence to indicate that Frankenbach and Spitzer were first in line for payment from the proceeds of ADC. The exact amount of profit (if any) generated by ADC is not in this record. Furthermore, Entheos' bankruptcy may have rendered the Entheos/Frankenbach-Spitzer Memo worthless despite any promises made by Ball. From the entire record in this case, it appears to this Court that summary judgment was correct on the issue of negligent misrepresentation.

Tortious Interference with a Contract

Frankenbach and Spitzer further allege that Ball "intentionally and maliciously induced Rose and Butler to permit Entheos to enter a contract with Ball and/or Scene 3 d/b/a STET with the intent and result of inducing Butler, Rose and Entheos to breach the contract with Frankenbach."

In order to recover on a theory of inducement to breach a contract, a plaintiff must allege and prove seven elements: (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff. *See Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn.1994); *Baker v. Hooper*, 50 S.W.3d 463, 468 (Tenn. Ct. App. 2001); *Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn.2002).

In the instant case, there is no evidence that Ball, STET, and/or Scene 3 were even aware of the Entheos/Frankenbach-Spitzer Memo:

> 102. Frankenbach does not know if Entheos ever gave the Entheos/Frankenbach-Spitzer memo dated August 30, 1995 to Ball, STET or Scene 3.
>
> RESPONSE:
>
> Admit
>
> 103. Frankenbach and Spitzer never personally showed to Marc Ball the Entheos/Frankenbach-Spitzer memo dated August 30, 1995.
>
> RESPONSE:
>
> Admit
>
> 104. In fact, Frankenbach and Spitzer do not have any knowledge as to whether the Entheos/Frankenbach-Spitzer memo dated August 30, 1995 was ever given to Ball.
>
> RESPONSE:
>
> Admit

However, even if we infer from Ball's payment of checks to Frankenbach and Spitzer that he was aware of the Entheos/Frankenbach-Spitzer Memo prior to entering into the Entheos/STET Agreement, there is still no proof that the creation of the Entheos/STET Agreement was the proximate cause of any breach of the Entheos/Frankenbach-Spitzer Memo. In fact, there is no proof in record to suggest that the Entheos/Frankenbach-Spitzer Memo was, in fact, breached. The Entheos/Frankenbach-Spitzer Memo does not indicate the Agents' priority in terms of payment. There is nothing in the Entheos/STET Agreement that actually conflicts with Frankenbach and Spitzer's receiving payment under their Memo. From our review of both of

these agreements, it appears that, notwithstanding Entheos' bankruptcy and/or the profitability of ADC, both contracts could have been fully performed. We cannot now, with hindsight, say that Frankenbach and Spitzer were entitled to receive their payments first because that condition is not evidenced in the plain language of the Entheos/Frankenbach-Spitzer Memo. We also cannot infer malice on the part of Ball to interfere with a contract (i.e. the Entheos/Frankenbach-Spitzer Memo) which, by all indication, could have co-existed with the Entheos/STET Agreement.

Interference with a Business Relationship

Our Supreme Court has expressly adopted the tort of intentional interference with a business relationships; and, accordingly, liability may be imposed for intentional interference with business relationships provided the plaintiff can demonstrate the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002).

The facts in record do not indicate that Ball had an intent to cause the breach of the business relationship between Entheos and Frankenbach and Spitzer. As discussed *supra*, the Entheos/Frankenbach-Spitzer Memo and the Entheos/STET Agreement could have existed in harmony. The mere fact that Ball entered into a separate agreement with Entheos is not, in itself, proof of any motive to usurp the existing agreement between Entheos and Frankenbach and Spitzer. To say that Ball had an improper motive here would be to go beyond the logical conclusions and inferences allowed from the facts in record.

Concert of Action/Joint Enterprise

Frankenbach and Spitzer allege that Ball, in concert with Entheos and the other original defendants in this case, exercised a common design in order to circumvent payment of amounts due Frankenbach and Spitzer under the Entheos/Frankenbach-Spitzer Memo. In short, the Agents are actually asserting a claim for civil conspiracy in that the creation of the Entheos/STET Agreement was allegedly done for the purpose of usurping the Entheos/Frankenbach-Spitzer Memo.

A civil conspiracy is a "combination between two or more persons to accomplish, by concert, an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Dale v. Thomas H. Temple Co.*, 208 S.W.2d 344, 347 (Tenn.1948). The essence of a civil conspiracy is a concert or combination to defraud or cause other injury to person or property, which results in damage to person or property of the plaintiff. *Kirksey v. Overton Pub., Inc.*, 739 S.W.2d 230, 236 (Tenn. Ct. App.1987). The elements of civil conspiracy are "common design, concert of action, and an overt act." *Id*. In addition, the primary purpose of the agreement

must be to cause injury to another; incidental injuries resulting from a pursuit of the parties' own fair interest are not actionable. **National Med. Care, Inc. v. Gardiner**, No. 85-154-II, 1986 Tenn.App. LEXIS 3559; WL 3157 (March 12, 1986) (citing 16 Am.Jur.2d Conspiracy § 49).

The record in this case contains no facts indicating an agreement between Ball, STET and/or Scene 3 and Entheos, Butler and/or Rose for the purpose of causing injury to Frankenbach and/or Spitzer. Indeed, there are no facts, save for bare speculation, that Frankenbach and Spitzer actually suffered injury by the creation of the Entheos/STET Agreement. While it is true that Frankenbach and Spitzer did not receive every type of agents' fee that was outlined in Scenario Two of the Entheos/Frankenbach-Spitzer Memo, there is no indication in this record that the ADC property was profitable enough to generate these monies. In addition, the fact that Entheos filed for bankruptcy may have rendered the Entheos/Frankenbach-Spitzer Memo worthless regardless of the Entheos/STET Agreement.

Assuming, *arguendo,* that there was a loss of monies due under the Entheos/Frankenbach-Spitzer Memo and that this loss was caused directly or even solely by the Entheos/STET Agreement, there are still no facts to indicate that the original defendants conspired for the purpose of injuring Frankenbach and Spitzer. From our reading of the record, we find that any allegations that Ball was involved in a grand scheme to defraud these Agents is founded on pure conjecture.

For the foregoing reasons, we affirm the trial court's Order, granting summary judgment to Ball, STET, and Scene 3. Costs of this appeal are assessed against the Appellants, Larry K. Frankenbach and Andrew L. Spitzer, and their respective sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.